### BIC SPORT USA, INC.

#### v.

### Michael KERBEL, et al.

### No. 3:93CV2402 (HBF).

United States District Court, D. Connecticut.

March 31, 1997.

---

Elias A. Alexiades, Margaret E. Haering, David A. Slossberg, Harris, Beach & Wilcox, Milford, CT, for Bic Sport USA, Inc., plaintiffs.

Hugh W. Cuthbertson, Glenn A. Duhl, Siegel, O'Connor, Schiff & Zangari, New Haven, CT, W. Wyndham Geyer, Jr., Teri L. DiGulian, Ruden, Barnett, McClosky, Ft. Lauderdale, FL, for Michael Kerbel, dba Windsurfing Express, aka Mickey Kerbel, Windsurfing Place, Inc., Windsurfing Places Inc. of Miami, defendants.

## *RULING*

FITZSIMMONS, United States Magistrate Judge.

Plaintiff filed this diversity action on December 3, 1993, against defendant Michael Kerbel individually,[1] and against the corporate entities Windsurfing Place, Inc. d/b/a Windsurfing Express ("Express"), and Windsurfing Places Inc. of Miami, ("Places"), for breach of contract, unjust enrichment and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. § 42–110(b). Plaintiff seeks compensatory damages, punitive damages and attorneys' fees and costs, pursuant to Conn. Gen.Stat. § 42–110g, and interest, pursuant to Conn. Gen.Stat. § 37–3a.

---

1. This Court granted defendants' Motion to Dismiss as to Mr. Kerbel in his individual capacity on August 10, 1995. [Doc. # 68].

Express brings counterclaims of breach of contract and violation of CUTPA and seeks damages for lost profits, lost business opportunities, loss of future income, compensatory damages, interest, damages to business reputation, punitive damages and attorneys' fees and costs. This Court deferred the presentation of evidence on punitive damages, costs and attorneys' fees pending a ruling on liability. [Ruling on Motion for Bifurcation, Doc. # 93].

A court trial[2] was held on November 13 through 17, 1995, in which the following witnesses testified for Bic: (1) Eric Treu, President of Bic[3]; (2) Matt LaChance, Customer Service Supervisor of Bic; and (3) Denise Nihill, Accounts Receivable/Collection Analyst. [Doc. # 97, 100–02, 104, 107]. Defendants presented the testimony of Michael Kerbel, president of Express and Places. [Doc. # 108].

Proposed findings of fact and conclusions of law were filed on December 14, 1995. [Doc. # 114, 115 & 116]. On April 4, 1996, defendants Windsurfing Place, Inc. a/k/a Windsurfing Express and Windsurfing By-Mail instituted Chapter 7 proceedings in the United States Bankruptcy Court for the Southern District of Florida. As a result, all matters were stayed in this action. [Doc. # 117]. Relief from stay was granted on June 7, 1996. [Doc. # 118].

For the reasons that follow, the Court finds for plaintiff in the amount $344,810.90 plus interest.

*UNDISPUTED FACTS*

The following facts were admitted in the pleadings or by stipulation:

1. Plaintiff BIC Sport U.S.A. Inc. ("BIC Sport") is a Connecticut corporation with a principal place of business at 565 BIC Drive, Milford, Connecticut. [Compl.[4] ¶ 2; Answer[5] ¶ 3 (admitted)].

2. BIC Sport distributes sailboards, commonly known as windsurfers, and related sporting goods and board sailing equipment. [Compl. ¶ 2; Answer ¶ 3 (admitted)].

3. Michael Kerbel, also known as Mickey Kerbel, is a resident of Florida engaged in the business of selling sailboards and related sporting goods and equipment. [Compl. ¶ 3; Answer ¶ 4 (admitted)].

4. Kerbel is an officer and director of defendants Windsurfing Place, Inc. and Windsurfing Places Inc. of Miami. [Compl. ¶ 3; Answer ¶ 4 (admitted)].

5. Kerbel is also an officer and director of Watersports Place Inc. and of other entities not a party to this action. [Compl. ¶ 3; Answer ¶ 4 (admitted)].

6. Defendant Windsurfing Place, Inc. is a Florida corporation with a principal place of business at 6043 N.W. 167th Street, Miami, Florida. [Compl. ¶ 4; Answer ¶ 5 (admitted)].

7. Defendant Windsurfing Place, Inc. does business under the fictitious name Windsurfing Express. [Compl. ¶ 4; Answer ¶ 5 (admitted)].

8. Defendant Windsurfing Places Inc. of Miami is a Florida corporation. [Compl. ¶ 5; Answer ¶ 6 (admitted)].

9. Windsurfing Places Inc. of Miami had a principal place of business in Key Biscayne, Florida. [Compl. ¶ 5; Answer ¶ 6 (admitted)].

10. Kerbel traveled to Connecticut on May 11, 1993 and October 20, 1993 to meet with Eric Treu and Bruno Bich. [Compl. ¶¶ 9, 15, 22; Answer §§ 10, 16, 23 (admitted)].

*Windsurfing Place, Inc. ("Express")*

11. Express placed orders by mail, telephone or fax with BIC Sport at its Connecticut offices. [Compl. ¶¶ 13, 16; Answer ¶¶ 14, 17 (admitted)].

12. Express regularly and repeatedly mailed catalogues and sales brochures to

---

2. The parties consented to a trial before a magistrate judge on November 9, 1995. [Doc. # 99].

3. Prior to 1995, Mr. Treu was the General Manager of Bic.

4. Plaintiff's Second Amended Complaint is cited herein as "Compl." [Doc. # 23].

5. Defendants' Windsurfing Place, Inc. and Windsurfing Places Inc. of Miami's Amended Answer, Affirmative Defenses and Counterclaim is cited herein as "Answer". [Doc. # 28].

Connecticut consumers through its mail order business. [Compl. ¶ 17; Answer ¶ 18 (admitted)].

13. In 1984, BIC Sport, which at the time was known as BIC Leisure Products, Inc., began to do business with Windsurfing Place, Inc. [Compl. ¶ 26; Answer ¶ 27 (admitted)]. Bic established house account number 19420 for Express. Doc. # 116 ¶ 3.

14. From time to time thereafter, Express purchased goods from BIC Sport for resale by defendant Windsurfing Place, Inc. at its Miami location. [Compl. ¶ 26; Answer ¶ 27 (admitted)].

15. The 1992/1993 Dealer Agreement and Mail Order Addendum attached to the Complaint as Exhibit A identifies Windsurfing Express as "Dealer". [Compl. ¶ 27; Answer ¶ 28 (admitted)].

16. On or about October 25, 1993, Ilan Neuwirth signed a BIC Sport Dealer Agreement on behalf of Windsurfing Places Inc. of Miami, ("Places"), a copy of which is attached to the Complaint as Exhibit B. Complaint ¶ 29; Answer ¶ 30 (admitted).

17. From time to time in 1992 and 1993, Windsurfing Place, Inc. ordered and BIC Sport delivered sailboards and related goods. [Compl. ¶ 32; Answer ¶ 33 (admitted)].

18. Windsurfing Place, Inc. by its employees and by its president, Kerbel, ordered goods to be billed to Windsurfing Place, Inc. [Compl. ¶ 32; Answer ¶ 33 (admitted)].

19. Windsurfing Places Inc. of Miami bought BIC merchandise from Windsurfing Place, Inc. [Answer ¶ 33 (admitted)].

20. Windsurfing Place, Inc. instructed BIC Sport to ship goods to Windsurfing Place, Inc. at 604 N.W. 167th Street, Miami, Florida and to Windsurfing Places Inc. of Miami at 3501 Rickenbacker Causeway, Key Biscayne, Florida. [Compl. ¶ 33; Answer ¶ 34 (admitted)].

21. Windsurfing Place, Inc. did not pay all of the invoices rendered to it by BIC Sport. [Compl. ¶¶ 38, 39; Answer ¶¶ 39, 40, 41 (admitted)].

22. Windsurfing Place, Inc. ordered and received delivery of goods from BIC Sport. [Compl. ¶ 42; Answer ¶ 43 (admitted)].

23. Windsurfing Place, Inc. did not pay all of the invoices rendered to it by BIC Sport. [Compl. ¶¶ 44, 48, 52, 53, 58, 60, 61; Answer ¶¶ 45, 49, 53, 54, 59, 62, 63 (admitted)].

24. Windsurfing Places Inc. of Miami purchased BIC Sport products from Windsurfing Place, Inc. [Compl. ¶ 45; Answer ¶ 46 (admitted)].

*FINDINGS OF FACT*

1. BIC Sport imports BIC sailboards, UP Sails, and other related products from BIC Sport, S.A. in Vannes, France for resale to retailers. [Doc. # 114 at 8].

2. BIC Sport, S.A. is a subsidiary of Societe Bic, S.A., a French corporation. [Doc. # 114 at 8].

3. BIC Corporation is a subsidiary of Societe Bic, S.A. [Doc. # 114 at 8].

4. Windsurfing Place, Inc. is referred to alternatively as "Express" and "Mickey's company". [Doc. # 114 at 8].

5. Windsurfing Place, Inc. operated its mail order business initially as Windsurfing By Mail and subsequently as Windsurfing Express. Doc. # 116 ¶ 8.

6. Express began retail sales to the public of windsurfers and related sporting goods and equipment in March, 1982. Doc. # 116 ¶ 2.

7. In 1989, Express discontinued all retail sales to the public from its Miami Lakes location and began selling sailboards and equipment through a mail order business known as Windsurfing by Mail. Complaint ¶ 13, Answer ¶ 14, Doc. # 116 at ¶ 6.

8. Windsurfing Places Inc. of Miami is referred to alternatively as "Places", the "Key Biscayne store", and "Ilan's store". [Doc. # 114 at 8].

9. In 1988, Kerbel signed a BIC Sport Dealer Agreement on behalf of Windsurfing Place, Inc. [Pl.Ex. 38, Doc. # 114 at 8].

10. Eric Treu has been employed by plaintiff BIC Sport U.S.A. Inc. since January 1991. He joined BIC Sport with the title of general manager. He was responsible for all day to day operations including sales management and reporting to BIC Sport's parent company, BIC Corporation. [Doc. # 114 at 9].

11. In January, 1995, Treu became president of BIC Sport. His duties and job responsibilities remained exactly the same. [Doc. # 114 at 9].

9. Treu has extensive experience in the windsurfing and watersports business, having been involved in that business since 1980 and full time in that business since 1983. [Doc. # 114 at 9].

10. Sailboards are also known as windsurfers. Sailboards are sold complete and semicomplete. [Doc. # 114 at 9].

11. A "complete" board consists of a board with a rig. A rig consists of a sail, mast and boom. [Doc. # 114 at 9].

12. A "semi complete" board is a sailboard sold without a rig. The "semi complete" board is also known as "hull only", and includes a fin, footstraps and mastfoot, depending upon the model. [Doc. # 114 at 10].

13. The wholesale sale season for each model year runs from September 1 through August 31. The major trade shows in the industry are conducted in the fall of each year. [Doc. # 114 at 10].

14. The 1992–1993 season ran from September 1, 1992 to August 31, 1993. [Doc. # 114 at 10].

*1992–93 Dealer Agreement*

15. On July 1, 1992, Eric Treu faxed Kerbel a copy of the Bic Dealer Agreement with the message, "Mickey. Please fill in the Dealer Agreement. Properly sign and return to me via return fax. Urgent you return to me A.S.A.P. Thanks–Eric" [Pl.Ex. 39].

16. The Bic Sport 1993 Buying Program dated September 1, 1992 set forth Bic's "Preseason" and "Early Season" discounts, and offered payment schedules and shipping deadlines to maximize discounts. It included the following terms:

> CONDITIONS OF SALE:
>
> A) Substantial changes or reductions to Preseason or Early Season orders forfeit all discounts and freight programs.
>
> B) Preseason and early season orders are valid only when submitted with 1993 dealer agreements.
>
> C) New accounts must include a New Dealer Application with their orders.
>
> D) Credit terms are available only to credit worthy accounts who maintain a current status with BIC Sport.
>
> E) Accounts past due 30 days will be charged interest of 1.5% per month or a maximum percentage by law on the past due balance.
>
> F) No shipments will be made to past due accounts.

[Pl.Ex. 40].

17. On October 1, 1992, Bic sent its dealers a letter stating, in relevant part,

> At BIC Sport, we feel 1993 should be better than 1992 if one condition is met: Pay Your Bills On Time! Our competition offers you less terms than we do, the result in some cases has been you paid them first. BIC Corporation, our mother company will no longer tolerate this. The consequences could be that we will no longer give extended dating or terms to accounts who pay poorly. It is crucial that you maintain a good credit rating with us so that we can continue to give you terms. As a result, our credit approvals and credit limits will be tighter in 1993.

[Pl.Ex. 41]. Eric Treu testified that the parent company wanted improved accounts receivable. [11/13/95].

18. Treu's notes of a meeting with Mickey Kerbel on December 2, 1992 state, in relevant part,

> Every order from Mickey must have a P.O. # otherwise send it back for a P.O. #, if price wrong send it back with written corrections. Everything must be in writing from now on.
>
> Agreements to be sent after reviewed by his lawyer within one day.

[Pl.Ex. 42].

19. Kerbel did not return a signed agreement as Treu requested in exhibit 39.

20. On April 8, 1993, at a meeting with Treu in Miami, Kerbel, as President of "Windsurfing Express," executed a 1992–93 Dealer Agreement, on behalf of defendant Windsurfing Place, Inc. [Pl.Ex. 46].

21. Treu signed the Dealer Agreement on behalf of BIC, in his capacity as general

manager, as a "duly authorized officer of BIC." [Pl.Ex. 46, ¶ 10.5].

22. Paragraph 8.1 of the Dealer Agreement provides,

Upon expiration or termination of this Agreement for any reason whatsoever, all unfilled orders from Dealer to BIC, whether or not theretofore accepted by BIC shall, at BIC's option be deemed canceled
. . . .

[Pl.Ex. 46, ¶ 8.1].

23. The Dealer Agreement included an appended Mail Order Addendum, amending, modifying and revising Section 2.7 of the Dealer Agreement. Amended § 2.7 requires, *inter alia,* that the dealer supply BIC with advance copies of marketing and advertising materials for BIC's approval. "To the event that Dealer fails to comply with the requirements of this paragraph 2.7, with respect to prior approval of sales literature, the program discount, to which Dealer may otherwise be entitled to receive from BIC, shall be forfeited by Dealer." [Pl.Ex. 46, Mail Order Addendum].

24. The Dealer Agreement incorporated by reference BIC Sport's standard terms and conditions as set forth in "BIC Sport 1993 Buying Program." [Pl.Ex. 46, § 4. Pl.Ex. 40].

25. A copy of the "BIC Sport 1993 Buying Program" was delivered to defendants. [Pl. Ex. 40, Doc. # 114 at 11].

26. The "BIC Sport 1993 Buying Program" warns that "[a]ccounts past due 30 days will be charged interest of 1.5% per month or a maximum percentage by law on the past due balance." [Pl.Ex. 40, Conditions of Sale (E)].

27. The "BIC Sport 1993 Buying Program" also provides that "[n]o shipments will be made to past due accounts." [Pl.Ex. 40, Conditions of Sale (F)].

*Outstanding Invoices: Uncontested*

28. Express concedes the accuracy of the amounts due on all invoices except the invoices numbered 2124, 3350, 6500, 6880, 10706, 10809, 10901, 10905, 10996 and 11096.[6]

29. Express does not contest the validity of invoices totaling $256,547.16. [Pl.Ex. 128]. No payments have been made on these invoices.

30. Places does not contest the validity of outstanding invoices totaling $561.52. [Pl. Ex. 129]. Treu testified that Ilan Neuwirth claimed he paid Express for those outstanding invoices; however, BIC never received payment on these invoices. Defendants did not present any evidence to show payment was in fact made to Express or BIC by Places.

*Outstanding Invoices: Contested*

31. Plaintiff seeks a total of $344,810.90 from Windsurfing Places, Inc.[7] [Pl.Ex. 128]. This is net of a credit to Express' account in the amount of $66,133.82. *Id.*

32. At trial, Express contested the amount due and owing on invoices numbered 2124, 3350, 6500, 6880, 10706, 10809, 10901, 10905, 10996, 11096, which total $153,836.04. [Pl. Ex. 128].

33. The balance due on invoice number 2124 is $584.10. This invoice is for a board shipped directly to a Windsurfing Express customers as a replacement for a board which was claimed to be defective. BIC Sport advised Express that it would issue a credit upon receipt of the nose of the defective board, which was never received by BIC. Express presented no evidence at trial to show that the nose was returned to BIC. The Court credits the testimony of Eric Treu on this invoice.

34. The balance due on invoice number 3350 is $466.00 which represents the difference between the amount of the original invoice and the amount paid by defendants. The boards at issue were correctly billed at the price of $525.60 each rather than the price of $479.00 each as claimed by defendant. The Court credits the testimony of Eric Treu on this invoice.

35. The balance due on invoice number 6500 is $395.22. A credit for this amount was

---

6. Defendants, however, raise several affirmative defenses to the breach of contract claims.

7. This number represents $256,547.16 (uncontested invoices) plus $153,836.04 (contested invoices) less $66,133.82 (credit to account) totaling $344,249.38.

included on credit invoice number 11965. Express, however, incorrectly deducted this amount on other invoices against outstanding balances. On the record before the Court, invoice number 6500 remains unpaid and outstanding. The Court credits the testimony of Eric Treu on this invoice.

27. The amount due for invoice number 6880 is $1,393.70 for sails delivered to Express. These sails were never returned to BIC Sport. The Court credits the testimony of Eric Treu on this invoice.

36. The amount due on invoice number 10706 is $265.82. There is no evidence to support defendant's claim that these were replacement parts omitted from an earlier shipment. The Court credits the testimony of Eric Treu on this invoice.

37. The amount due on invoice number 10809 is $519.20 for a board hand delivered to Express by a BIC Sport sales representative. The Court credits the testimony of Eric Treu on this invoice.

38. The amount due on invoice number 10901 is $55,520. The Court finds the merchandise was correctly billed based on the sale prices in effect at the time. Express concedes that at least $53,380.00 is due, but has not paid this amount. Defendant disputes $2,140. The Court credits the testimony of Eric Treu on this invoice.

39. The amount due on invoice number 10905 is $15,380. The Court finds that the merchandise was correctly billed at the sale prices in effect at the time. Express concedes that at least $13,980.00 is due, but has not paid this amount. Defendant disputes $1,400. The Court credits the testimony of Eric Treu on this invoice.

40. The amount due on invoice number 10996 is $18,602. The Court finds that the merchandise was correctly billed at the sale prices in effect at the time. Express concedes that at least $16,504.00 is due, but has not paid this amount. Defendant disputes $2,098.00. Express presented insufficient proof at trial to show that it returned two boards that it claims were damaged. The Court credits the testimony of Eric Treu on this invoice.

41. The amount due on invoice number 11096 is $60,710.00. The Court finds that the merchandise was correctly billed at the sale prices in effect at the time. Express concedes that at least $59,810.00 is due, but has not paid this amount. Defendant disputes $900.00. The Court credits the testimony of Eric Treu on this invoice.

42. Considering amounts due on the contested invoices, Express owes BIC a total of $344,249.38.

*Private Label Boards*

43. At a meeting in Miami in April, 1993, Kerbel approached Treu with the idea of purchasing private label boards from BIC. Treu told Kerbel that a private label deal would require approval from Bruno Bich, President and C.E.O. of BIC Corporation, the parent company.

44. On May 11, 1993, Kerbel met with Bruno Bich in Connecticut to discuss a deal to manufacture private label boards for Express. On May 12, 1993, Kerbel faxed Treu a letter outlining the contours of the deal.

> Thank you for inviting me to your offices to discuss future business. In our meeting we discussed the possibility of BIC making two boards at a maximum price of $450 each.
>
> We agreed to an order of 500 × Metal Rocks and 250 × Adagios. 200 boards are to be shipped on October 15, 1993 and the balance is to be shipped on December 15, 1993 (note these are the ship dates, not arrival dates). The terms are 5 months for the October shipment and 4 months for the December shipment (dating is to start the date we receive the boards, not the invoice date). Windsurfing Express agrees to supply 3–color artwork for the boards.

[Pl.Ex. 50].

45. On May 19, 1993, Treu received a copy of the first page of the Stipulation for Settlement by fax from Kerbel in the case of *Windsurfing Place, Inc. d/b/a Windsurfing By Mail; Windsurfing Places of Miami, Inc.; and Windsurfing Places of Palm Beach, Inc. v. Mistral, Inc.* [Pl.Ex. 51]. Treu testified that Mistral is a German Company that manufactures windsurfers and is considered one of the top five manufacturers in the world of windsurfer products. It concerned

Treu that Kerbel owed a substantial amount of money to Mistral because Kerbel also owed money to BIC. It was a credit issue for Treu.

46. In July, 1993, Kerbel canceled the private label order for 250 Adagios.

47. At a trade meeting in Munich, Germany, during the first week in September, 1993, Treu testified that he learned that Kerbel would become the exclusive distributor for Fanatic in North America. Fanatic is considered the second largest company in the world for windsurfing products.

48. Treu testified that Kerbel's position as a distributor of Fanatic boards raised a conflict of interest in BIC's eyes. Treu explained that Kerbel had agreed to purchase 500 private label boards from BIC and had placed a significant order for other BIC boards for the 1993 season. Yet Kerbel was poised to become a serious competitor of BIC.

49. Treu testified that Kerbel reassured Treu that he did not want to disturb his relationship with BIC. Treu testified that Kerbel told him that his association with Fanatic was to secure the line but he still intended to maintain BIC as his primary line. Treu stated that his relationship with Kerbel was based on trust and he believed what was said until a trade show in San Francisco in October, 1993.

50. Between May and September 18, 1993, BIC did not have a signed agreement or purchase order for the private label deal.

51. On September 16, 1993, Treu received a letter from Francoise LeLamar of BIC France, regarding the preparation of the 500 Metal Rock boards, placement of design, footstraps, fin, mastfoot and mastfoot plate, with photos. LeLamar stated, "WE URGENTLY NEED YOUR AGREEMENT BEFORE STARTING THE PRODUCTION." [Pl.Ex. 56]. Treu testified that Kerbel had reduced his original order to 500 boards and had not approved the art work at this time.

52. On September 18, 1993, in Orlando, Florida, Treu drafted the basic elements of a private label agreement for 500 Metal Rock windsurfers. "250 shipped on October 15, 1993 and 250 shipped on December 15 or 2 months after first shipment whatever later. Terms: 5 months for 1st ship. 4 months for

2nd shipment. Cost: $450. F.O.B. Miami w/ Express warehouse. All boards are semi-complete." The agreement was signed by Mickey Kerbel and Eric Treu. [Pl.Ex. 58].

53. As of September 18, 1993, Kerbel had not approved the artwork for the first shipment of boards.

54. On September 28, 1993, Kerbel sent Treu a faxed message reducing the quantity of the private label boards for a second time. His fax transmission states:

Subject: 250 Private Label Boards

1. Yesterday afternoon I got the new picture w/the design-it is not large enough please communicate it to them. It should cover all the front deck area.

2. We need to buy only 250 boards *we will not be able to guaranty payment for more than this #*.

[Pl.Ex. 60] (emphasis added).

55. Treu testified that BIC would never have agreed to a private label order for 250 boards. Since original pricing was based on an order of 500 boards, he had to check with BIC France to see if they wanted to proceed. BIC France had already initiated the production of the boards. BIC France responded that they would produce the first 250 boards at a cost of $470. If Kerbel bought 250 in a second order they would sell the boards at $430.

56. Kerbel explained he reduced the order because he was not sure he could sell the boards.

57. Kerbel faxed BIC a purchase order for 250 private label Metal Rock boards at a cost of $450. [Pl.Ex. 61]. The purchase order was not accepted by BIC.

58. On October 1, 1993, BIC France faxed Kerbel an urgent message to approve the graphics for the private label boards. "We urgently need your reply and confirmation for 4:00 pm in France that means in one and a half hour at the latest!!" [Pl.Ex. 62 & 63]. No final confirmation was ever received at BIC France or BIC USA from Kerbel.

59. Treu testified that, since the graphics were late, the boards would not be delivered until November. Kerbel agreed to the terms.

60. As of October 4, 1993, Express' account was past due in excess of $150,000. Kerbel was sent a fax, stating, "Please find a copy of your most current agings. As you will see, you[r] account is seriously past due. I need to receive[ ] payment immediately. Please call me today with payment schedule." [Pl. Ex. 69].

61. Treu attended a trade show in San Francisco during the first week of October, 1993. At the show, which typically lasts three days, companies display their product line and see over 150 customers. It is the major show of the year. BIC books over 60% of its business at this trade show.

62. Upon his arrival at the trade show, Treu testified that he realized that Kerbel had lied to him regarding his relationship with Fanatic. Treu discovered Kerbel was the "full-on distributor" for Fanatic, meeting with customers and distributing a manual similar to BIC's, but listing BIC next to the retail and discount structures for competitors' boards, and offering 1–(800) DIRECT TO YOU telephone marketing plan. [Pl.Ex. 72].

63. Treu was informed that Kerbel met with BIC's top ten accounts at the trade show. The accounts came to Treu and told him of Kerbel's efforts to get them to carry Fanatic.

64. Treu discovered that Kerbel's manual positioned the Fanatic boards at a price below that for which BIC could sell their product. Treu told Kerbel that the trust was broken, that Kerbel was obviously going head to head with BIC competitively, that Kerbel had made no payments on his account, and that Treu would consider terminating their business relationship after discussing it with Bruno BIC.

65. In particular, Treu balked at offering Kerbel five (5) month terms on the private label boards to finance Kerbel's business with Fanatic. Treu told Kerbel that he needed a guarantee of payment with a letter of credit for 90 days. Kerbel said, "forget it," he didn't want a deal with a letter of credit. Treu understood Kerbel was canceling the private label deal, because he had rejected the requirement of a letter of credit and also because Kerbel could purchase Alpha/Fanatic boards for less than private label boards.

66. BIC's sales to Express represented approximately 12% of its market share and was BIC's number one dealer.

*October Meeting in Connecticut*

67. Kerbel requested another meeting with Bruno Bich in Connecticut. By letter dated October 14, 1993, Treu replied,

This will confirm our telephone conversation this morning that all finance charges on the current outstanding amount of $151,984.56 will be voided if payment of $60,000 is released today and Federal Expressed to BIC Sport USA and received at this office on October 15, 1993.

Also, as agreed, Windsurfing Express of Miami and Windsurfing Place of Key Biscayne accounts past due be paid in full by October 20, 1993, prior to your meeting with Bruno Bich on October 20, 1993.

[Pl.Ex. 78]. This letter agreement was signed by Eric Treu and Mickey Kerbel. Treu testified that Bich was very concerned about the amount past due and understood it would be paid in full as one of the conditions of the meeting. A check for $60,000 was received on Monday, October 18, 1993.

68. On October 20, 1993, Kerbel arrived for his meeting with Bich in Connecticut. Kerbel showed Treu his check for $78,490 to bring his accounts up to date but refused to tender the check until after the meeting with Bich.

69. Treu testified that Kerbel proposed a joint venture with BIC to manufacture an inflatable knee surfer with a light rig at the meeting with Bruno Bich. Bich asked Kerbel what effect this joint venture would have on Fanatic. Kerbel was unprepared to address how Fanatic would respond to a business venture between BIC and Kerbel. Mickey stated, "don't need to tell Fanatic." Bich directed Kerbel to speak with Treu about the business venture. Finally, Bich asked Kerbel to pay his bills on time. Kerbel stated, "I will pay you what I owe you."

*Agreement to Return BIC Product*

70. After the meeting with Bruno Bich, Kerbel and Treu returned to Treu's office. Treu informed Kerbel that BIC would no

longer sell Kerbel any products in 1994 and canceled the private label deal.

71. Treu also asked Kerbel what he would do with the 1993 BIC product shipped to him in July and August. Treu testified that Kerbel told him he would "just get rid of them, dump them on the market, sell them out." Treu stated he would take back all of the 1993 products left over and also the 1994 products being introduced. Treu estimated that Kerbel had at least 300 boards and requested the returns be made as soon as possible.

72. Treu testified that he would take the returns so long as Kerbel promised not to advertise the boards at a low price. Treu was concerned about taking back a large quantity of product after the San Francisco trade show and requested an inventory list of the returns so that they could be sold to retailers.

73. Treu also asked Kerbel for the $78,490 check in payment of the outstanding invoices. Kerbel responded that since he was returning product and BIC would be issuing credit, he would not give BIC the payment.

74. On October 25, 1993, Kerbel faxed an inventory list of the BIC stock he sought to return. The list included 650 boards, of which 544 were 1993 models and 87 were 1992s. [Pl.Ex. 85].

75. Treu testified regarding the difficulty of matching the boards and rigging with invoiced prices. Kerbel's list did not provide this information. [Pl.Ex. 85, 89].

76. BIC prepared a preliminary list against the invoices for pricing on October 26, 1993, authorizing the return of 519 boards and 149 rigs. [Pl.Ex. 89].

77. Kerbel responded by fax on October 27, 1993,

> This is to confirm that we received your RA# 588069 yesterday. Your fax does not mention the fact that we agreed on no restocking charge or any other charges associated with this return. The first truck is scheduled to go in few days.

[Pl.Ex. 93].

78. Treu responded the same day stating,

> Depending on the condition of the packaging and if all the boards are '93 and in perfect resale condition as well as the rigs, there will be no restocking charge. Freight must be prepaid or shipments will be refused.

[Pl.Ex. 94].

79. On October 27, 1993, Treu sent a letter to BIC's customers stating,

> It was not secret that Windsurfing Express was our Number One customer in 1993. Due to the recent decision of Windsurfing Express via Watersports Trading Inc. to become the distributor of Fanatic, Alpha, Copello and ART for North America, BIC Sport USA will not be renewing our dealer agreement with Windsurfing Express for the upcoming season. Therefore Windsurfing Express will no longer sell 1994 Racetech boards through its mail order catalog for the 1993–94 season.
>
> In order to prevent any damage to our product line next season, we have decided to take back all the 1993 boards Windsurfing Express currently has in stock.
>
> I wish to thank all of you including Windsurfing Express for your support in the 1993 season and look forward to an exciting and challenging 1994 year.

[Pl.Ex. 95].

80. The first return shipment of about 100 boards was received from Express on November 5, 1993. [Pl.Ex.96]. Express forwarded a packing list on November 9, 1993. [Pl.Ex. 97].

81. On November 9, 1993, Treu faxed a letter to Kerbel thanking him for the first shipment returned.

> It is very important that we start to receive the remainder of boards. Please inform us of the dates they will be returned as well as the product on each container. If you fail to return the product within 8 days, we will impose a 15% assessment for restocking fee on product that is not yet returned.

[Pl.Ex. 98].

82. Treu testified he was desperate to receive boards back from Kerbel due to the short window to sell product and the response to his mailing offering the boards to other dealers at a reduced price. Kerbel

indicated that he wanted to wait for the credit before returning more boards.

83. Matt LaChance and Denise Nihill reviewed the return stock, noted the serial numbers of the boards and compared them to the invoices to determine the credit for each returned item. Ms. Nihill provided an explanation of the credit calculation of $65,-385.64 with supporting documentation to Kerbel in a letter dated November 10, 1993. [Pl.Ex. 101–A]. The credit was issued on November 12, 1993. [Pl.Ex. 128].

84. As of November 10, 1993, Express was still offering BIC boards for sale. [Pl.Ex. 106].

85. On November 12, 1993, Treu sent a letter to Kerbel to follow up on their telephone call of November 11, 1993. He stated,

> 1) BIC Sport USA *will not* charge a restocking fee for product to be returned or already returned by Windsurfing Place/Express.
> 2) It is imperative that we receive all product by *November 29, 1993.*
> 3) Please refer to paragraph 8.2 of your Dealer Agreement which provides BIC Sport, USA the option upon termination to repurchase all product in Dealer's possession. BIC has already notified you that it intends to exercise this option and expects your complete cooperation.
> 4) You are no longer an Authorized Dealer of BIC Sport USA products and, therefore, have no further right to sell, offer for sale or distribute BIC products. All products must be returned to BIC Sport USA by November 29, 1993.
> Please provide written confirmation no later than Wednesday, November 17, 1993 that all boards and accessories will be returned by November 29, 1993.

[Pl.Ex. 107]. No confirmation was received.

86. On November 19, 1993, Kerbel faxed a letter with an accompanying list. "In addition to the list we gave you before I would like to be able to send you back these items." [Pl.Ex. 109]. Treu responded to the fax and requested an update of all the quantities, year and size of rigs sought to be returned. [Pl.Ex. 112].

87. On November 22, 1993, BIC received the Windsurfing Express 1993 Holiday Gift Guide featuring BIC products for sale. [Pl. Ex. 113].

*Termination of Dealer Agreement*

88. By letter dated November 23, 1993, BIC served formal notice on Kerbel of termination of the Dealer Agreement. BIC declined to exercise its option to repurchase its inventory pursuant to section 8.2 of the Agreement and made demand for full and complete payment of all past due invoices by Monday, November 29, 1993. [Pl.Ex. 116].

89. Treu testified that he spoke with Kerbel on December 3, 1993, regarding the termination. Treu's notes of the conversation state "he proceeded to threaten me that he would bring in 1993 and 1994 BIC boards in his catalog if we did not accept his conditions." If BIC took the boards back, Kerbel agreed to

> Return everything he wanted left in stock starting December 25, 1993
>
> He would not try to sell any BIC boards either 1993 or 1994
>
> He would pay his outstanding balance once all the returns were credited
>
> He would refuse to pay any finance charges since he considers we are in dispute at this point

[Pl.Ex. 134].

90. Kerbel faxed a memo on December 8, 1993

> This is the details of our last phone conversation. 1. Few weeks ago you gave me a RA#. I am interested to return these boards. 2. You will take these boards, I will not sell BIC 1993, 1994 or any year unless you approve. 3. Payments will be made on our account. 4. You will take care of all future warranty claims to do with BIC product that we sold. 5. Again, I am very disappoint[ed] that you decided not to sell BIC boards to our company as we sold over 1200 boards in 1993 and I know we could have sold as much (or more).

[Pl.Ex. 117].

91. Treu testified that Kerbel made no mention of the cancellation of the private

label deal in either his phone conversation or his follow-up fax.

92. After the meeting with Bruno Bich, Treu contacted BIC France and formally canceled the private label order. BIC USA was charged for the expenses associated with the foam core produced, art work and graphics at approximately $5,000. [Pl.Ex. 119, 120]. Treu instructed Denise Nihill to tell Kerbel about the fee for canceling the private label deal.

93. Plaintiff filed this action on December 3, 1993.

94. On December 17, 1994, Kerbel faxed Treu "per our agreement the first 250 boards are to be here about this time (left France about October 15, 1993) Please advise shipping information thanks." [Pl.Ex. 35].

*Operation in Fictitious Name*

95. After BIC terminated its relationship with Express, Treu asked Denise Nihill to contact Ilan Neuwirth to ascertain the ownership of Places in Key Biscayne.

96. In a letter dated December 1, 1993 to Nihill, Ilan Neuwirth stated

> I am faxing you the corporation paperwork, there [are] two shareholders 50% Ilan Neuwirth, 50% Mickey Kerbel. Windsurfing Places is Ilan Neuwirth.
>
> Windsurfing Places! (not place) is not affiliated with Windsurfing Express or Place in any way.

[Pl.Ex. 122].

97. On December 30, 1993, BIC received a letter from Neuwirth stating the Key Biscayne story was closed and Windsurfing Place relocated to Coconut Grove. "The corporation and officers are the same, but our name has been changed from Windsurfing Place to Waterplay, Inc." [Pl.Ex. 123].

98. Kerbel testified that a 1993 hurricane destroyed Places in Key Biscayne, and they closed the business, and started a new business in Coconut Grove called Waterplay.

99. BIC also received a letter from Neuwirth on letterhead of "Watersport Concession Supply" with a separate address in Key Biscayne. [Pl.Ex. 125].

*Credit Invoices*

100. Express is not entitled to a credit for five "Electric Rock" model sports which they claim were omitted from a direct shipment from France. BIC Sport supplied five substitute boards for which Express was not charged. Express has not sustained its burden on this claim.

101. Express is not entitled to a credit in the amount of $1,500 for shipping costs for the container of boards which Express returned to BIC Sport in November, 1993. The Court finds that Express agreed to pay the freight. Express has not sustained its burden on this claim.

102. Express is not entitled to an additional credit in the amount of $6,650 for the container of returned boards. The Court finds that the Credit Invoice in the amount of $65,385.64 is based on the actual invoiced cost to Express. The Court credits the testimony of BIC Sport employees Matt LaChance and Denise Nihill, who acted under the direction of Eric Treu, that a diligent investigation of BIC Sport's records was conducted to arrive at the correct amount. Express did not rebut this testimony or provide further evidence at trial in support of its claim. For example, Kerbel testified that he did not track the boards by serial number, or base his claim on actual invoiced cost, but rather on average cost. The Court finds Express did not carry its burden on this claim.

103. Express' account was credited by BIC in the total amount of $66,133.82. [Pl.Ex. 128].

*CONCLUSIONS OF LAW*

1. Jurisdiction is predicated on diversity of citizenship, pursuant to 28 U.S.C. § 1332. [Compl. ¶ 6; Answer ¶ 7 (admitted); Def. at 27; Doc. # 94 at 1].

2. Personal jurisdiction over defendant Windsurfing Place, Inc., doing business under the fictitious name Windsurfing Express, ("Express"), is conferred by agreement. [Compl. ¶¶ 13, 14; Dealer Agreement ¶ 10.2 (Exhibit 46); Stipulation and Order regarding Prejudgment Remedy ¶ 1 (November 17, 1995); Doc. # 116 at 27].

*Breach of Contract*

3. Connecticut law applies pursuant to the 1992–93 Dealer Agreement. [Pl.Ex. 46, § 10.2]

4. The Court finds that Express and Bic were bound by the terms set forth in the 1992/93 Dealer Agreement. Eric Treu was authorized to sign on behalf of BIC. The agreement was in entered into as of September 1, 1992 and was in effect until terminated by BIC on November 23, 1993.

5. Section 7.1 of the Agreement states that

This Agreement may be terminated by either party: (a) Immediately, in the event that the other party materially breaches any of the terms of this Agreement other than the payment of money, and such breach is not remedied within a period of 15 days after notification thereof . . .

[Pl.Ex. 46, § 7.1].

6. Section 7.3 of the Agreement states that

BIC shall have the right to terminate this Agreement upon 15 days written notice to Dealer at any time during the term of this Agreement if Dealer shall be in default for more than 15 days in the payment of any amount due BIC under this Agreement including any Products purchased hereunder.

[Pl.Ex. 46, § 7.3].

■ 7. The Court finds that the relationship between BIC and Express had irrevocably broken down. Express had outstanding invoices over 90 days that remained unpaid after demand. Further, Kerbel become the exclusive dealer of Fanatic in North America, raising a conflict of interest because Fanatic was a direct competitor of BIC's. Kerbel demonstrated in San Francisco that he was competing for the same BIC accounts. This conflict of interest and non payment constituted a breach and termination was warranted. *See* Pl.Ex. 46 §§ 7.1, 7.3.

8. Section 8.2 of the Agreement states

Upon expiration or termination of this Agreement for any reason whatsoever, BIC shall have the option, at its sole discretion, exercised by notifying Dealer within thirty (3) days after the effective date of such expiration or termination, whichever is later, to repurchase from Dealer any and all of the Products on hand or in transit to the Dealer.

[Pl.Ex. 46, § 8.2].

■ 9. The Court further finds that Express breached the Return Agreement and its duty to act in good faith and fair dealing in making the returns. Express did not return the BIC product in a timely, expedited manner after repeated requests and it breached its promise not to advertise or sell any BIC product. On the record before the Court, BIC's decision to exercise its discretion not to repurchase its remaining product was warranted and permitted under section 8.2 of the Agreement.

10. The Court finds that the outstanding balance for unpaid invoices, owed by Express, less credits totals $344,249.38.

11. The Court finds that the outstanding balance for unpaid invoices owed by Places totals $561.52. Since Kerbel was President of both Express and Places, he had authority to contract on behalf of both entities. The record reflects that BIC shipped product and billed invoices to Places and the invoices remain unpaid. Neither Express nor Places provided any evidence to show that BIC was paid on these invoices. Accordingly, Places argument fails.

*Unjust Enrichment*

Since the Court has found in favor of plaintiff on its breach of contract claim, the Court does not address plaintiff's alternate claim for unjust enrichment.

*CUTPA*

■ Plaintiff claims that defendants' breach of contract also constitutes a violation of CUTPA. However, plaintiff fails to cite any case law in support of its claim that Express and Places violated the Connecticut Unfair Trade Practices Act. In particular, plaintiff fails to demonstrate how defendant's breach of contract rises to the level of an unfair trade practice under CUTPA.

Bic contends that the following conduct on behalf of Express and Places constitutes unfair trade practices pursuant Conn. Gen.Stat. § 42–110b *et seq.*

1. Defendants used fictitious names and remarkably similar corporate names to create confusion and avoid payment;
2. Defendants obtained large quantities of goods on extended payment terms and resold the goods but failed to pay;
3. Defendants ordered and received delivery of large quantities of goods immediately prior to commencing direct competition with plaintiff, in effect causing plaintiff to finance defendants' competitive activities.
4. Defendants agreed to return plaintiff's goods for credit but did not intend to do so. Rather, defendant Express advertised for sale the same goods which it promised to return and advertised such goods for sale at/or near wholesale cost, thereby damaging plaintiff.
5. Defendant Express' practice of threatening non-payment and using its large outstanding balance as leverage.

[Pl. Trial Mem. Doc. # 94 at 3–4].

Our Court of Appeals holds that

[a] simple contract breach is not sufficient to establish a violation of CUTPA, particularly where the count alleging CUTPA simply incorporates by reference the breach of contract claim and does not set forth how or in what respect the defendant's activities are either immoral, unethical, unscrupulous or offensive to public policy.

*Boulevard Associates v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1039 (2d Cir.1995) (quoting *Chaspek Mfg. Corp. v. Tandet*, 1995 WL 447948, at *12 (Conn.Super.Ct. June 16, 1995)) (*see* Connecticut decisions cited therein for the majority rule that a simple breach of contract does not violation CUTPA); *c.f. Lester v. Resort Camplands Int'l, Inc.*, 27 Conn.App. 59, 72, 605 A.2d 550 (1992) (affirming jury's findings that breach of contract constituted a CUTPA violation); *Bridgeport Restoration Company, Inc. v. A. Petrucci Construction Co.*, 211 Conn. 230, 557 A.2d 1263 (1989) (same). A conclusion "that a company violates CUTPA whenever it breaks an unprofitable deal—would convert every contract dispute into a CUTPA violation." *Id.* (holding that Connecticut legislature, in enacting CUTPA, could not have

intended such an extraordinary alteration of the common law). "Because a breach of contract standing alone does not offend public policy to invoke CUTPA, [BIC] was required to show that the defendants engaged in some conduct that was more offensive than simply not paying ...." *Id.* This Court finds that plaintiff has not established a causal connection between the use of fictitious names and any damages BIC has sustained on its breach of contract claim.[8] BIC has failed to allege, much less prove, any aggravating circumstances surrounding the breach of contract. Accordingly, plaintiff's CUTPA claim is DENIED.

*Interest*

■ 12. The "BIC Sport 1993 Buying Program" states that "[a]ccounts past due 30 days will be charged interest of 1.5% per month *or* a maximum percentage by law on the past due balance." [Pl.Ex. 40, Conditions of Sale (E)] (emphasis added).

13. Conn. Gen.Stat. § 37–3a states "interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions...."

14. Accordingly, plaintiff is entitled to interest at the statutory rate of ten (10) percent per year pursuant to Conn. Gen.Stat. § 37–3a, calculated for each invoice from the date it became thirty (30) days past due in accordance with the 1992/93 Dealers Agreement.

*Express' Breach of Contract Claim*

■ Having found that BIC's termination of the Dealer Agreement was warranted, this Court also finds that BIC's termination of the Dealer Agreement effectively terminated the Private Label Agreement too. Section 8.1 of the Agreement states

Upon expiration or termination of this Agreement for any reason whatsoever, all *unfilled* orders from Dealer to BIC, whether or not theretofore accepted by BIC shall, at BIC's option, be deemed canceled ....

[Doc. # 46, § 8.2].

■ Even if the Court considered the Private Label Deal a separate contract not con-

---

**8.** At best the use of fictitious names affected BIC's claim of $561.52 to Places.

trolled by the terms of the Dealer Agreement, Express' breach of contract claim would still fail. The Court has considered the record and finds that the Private Label Agreement was significantly modified on two occasions. In May, 1993, the original agreement was for 250 Adagio boards and 500 Metal Rock boards. [Pl.Ex. 50]. The first modification was in July, when Kerbel canceled the order for Adagio boards, reducing the order by one third. In September, BIC sought assurances from Kerbel that his association with Fanatic would not alter their business relationship. These assurances were given. On September 18, 1993, the parties signed an agreement for 500 Metal Rock boards. The agreement included quantity, price, shipping and financing terms. [Pl.Ex. 58]. Ten days later, a second modification was sought by Kerbel to reduce his order to one third of its original quantity, that is, 250 only. [Pl.Ex. 60]. The Court credits Treu's testimony that approval for this modification was necessary from BIC France and that BIC France responded with a price increase, changing the terms further. BIC France would now agree to produce 250 boards at a cost of $470 per board. No purchase order was submitted to reflect the new terms of the deal, nor did Kerbel respond to BIC France's urgent message regarding graphics for the private label boards. The Court finds on these facts that Kerbel had not acknowledged acceptance of the new price terms.

Finally, less than a week later in San Francisco, BIC sought further assurances to proceed with the private label deal in light of Kerbel's significant activities as a dealer for Fanatic. BIC requested a letter of credit in order to proceed. The Court credits Treu's testimony that Kerbel refused to consider these terms. On this record, it was reasonable to conclude that the private label deal would not proceed. Indeed, after the October meeting with Bruno Bich, it was clear that BIC was terminating all aspects of its relationship with Express and Mickey Kerbel.

Accordingly, this Court DENIES Express' counterclaim for breach of contract.

*Express' CUTPA Claim*

Since Express alleges that BIC's alleged breach of the private label deal constitutes a CUTPA violation, for the reasons stated above, the Court finds that Express' CUTPA claim also fails.

*CONCLUSION*

For the reasons stated, judgment shall enter in favor of plaintiff on its breach of contract claim in the amount of $344,810.90 against Windsurfing Place, Inc. and in the amount of $561.52 against Windsurfing Places Inc. of Miami. Plaintiff is entitled to interest at the statutory rate of ten (10) percent per year, pursuant to Conn. Gen. Stat. § 37–3a, calculated from the date each invoice became thirty (30) days past due.