In the Matter of William K. HOLMES, Debtor.

William K. Holmes and Airtrek, LLC, Plaintiffs,

v.

General Electric Capital Corporation, Defendant.

Bankruptcy No. 02–52793 RFH. Adversary No. 03–5280.

United States Bankruptcy Court, M.D. Georgia, Macon Division.

June 8, 2007.

Joseph J. Burton, Jr., Rosemary Armstrong, Atlanta, GA, for Plaintiffs.

John F. Isbell, Mark M. Maloney, Atlanta, GA, for Defendant.

## MEMORANDUM OPINION

ROBERT F. HERSHNER, JR., Chief Judge.

William K. Holmes and Airtrek, LLC, Plaintiffs, filed a "Complaint" on October 10, 2003. General Electric Capital Corporation, Defendant, filed an answer and asserted a counterclaim on May 10, 2004. Plaintiffs filed a response to the counterclaim on May 27, 2004.

This adversary proceeding came on for a bench trial on April 10, 2006. The Court heard some four and one-half days of testimony. The Court entered an order on July 12, 2006, allowing Plaintiffs to amend their response and their defenses to Defendant's counterclaim. Plaintiffs and Defendant filed post-trial briefs. The Court, having considered the evidence presented and the arguments of counsel, now publishes this memorandum opinion.

## FINDINGS OF FACT

Defendant has been in the business of leasing and financing the purchase of corporate aircraft since 1977. Defendant's customers include individuals and corporations. About 65 percent of Defendant's business involves making a loan to enable a customer to purchase an aircraft from a third party. About 35 percent of Defendant's business involves a customer finding an aircraft that it wants to use, Defendant purchasing the aircraft from a third party, and Defendant then leasing the aircraft to its customer. Finally, about once a year Defendant purchases an aircraft to hold in

its portfolio. Defendant then finds a customer who wants to lease or purchase the aircraft. Defendant usually becomes the lessor of the aircraft or finances the purchase for its customer.

Defendant currently provides leasing and financing services for about 1,500 customers. Defendant is the largest provider of such services. Defendant has a 10 percent share of the corporate aircraft leasing and financing market.

Defendant has standard forms that it uses for its aircraft leases. The aircraft leases at issue in this adversary proceeding are on the standard forms. The leases are structured to be true tax leases. The standard lease form sets forth the rights and obligations of Defendant as the lessor and of the customer as the lessee. The specifics of a particular aircraft transaction are set forth in "annexes" to the lease. The annexes include a description of the aircraft, the "capitalized lessor's cost," monthly rent payments, and the term of the lease.

The capitalized lessor's cost is the price that Defendant charges the customer to lease the aircraft. Monthly rent is determined in part by the capitalized lessor's cost and by the length of the lease term.[1] The capitalized lessor's cost is, at the commencement of the lease, the same value as the fair market value of the aircraft.[2] The capitalized lessor's cost, however, may not be the price that Defendant paid to purchase the aircraft. For example, Defendant may have purchased the aircraft at a bargain price.

Section 12(a)(i) of the standard lease form provides that an event of default includes the lessee's failure to pay rent when due and the failure to cure the breach within ten days ("ten-day grace period"). Section 12(b)(i) provides that upon default, Defendant may demand that the lessee immediately pay as liquidated damages, for loss of the bargain and not as a penalty, an amount equal to the "stipulated loss value" of the aircraft plus all rent and other amounts due. Section 12(b) also provides that Defendant may, by notice in writing, terminate the lease, peacefully take possession of the aircraft, and sell or otherwise dispose of the aircraft. Defendant's representative, David Labrozzi, testified that in a default situation, Defendant attempts to receive the entire benefit of the bargain because Defendant spends a lot of time, effort, and management attention in working through the situation.[3]

Annex F of the standard lease form lists the stipulated loss value of the aircraft for each month of the lease term. The stipulated loss value generally decreases each month as rent is paid. The stipulated loss value is the sum of the Book ROI (return on investment) Protect Termination Value[4] plus a "casualty adder." The amount a lessee in default must pay is determined by multiplying the stipulated loss value times the capitalized lessor's cost of the aircraft.[5]

1. Monthly rent for a short-term lease is usually higher than the rent for a long-term lease.

2. Trial Transcript, Day 4, pp. 11–12.

3. Trial Transcript, Day 4, pp. 27–28.

4. Book ROI (return on investment) Protect Termination Value is the amount Defendant would have to receive in order to make the return on investment that Defendant anticipated in that particular month. Trial Transcript, Day 2, pp. 173–174; Day 4, p. 112.

5. For example:

| Book ROI Protect Termination Value | + | Casualty Adder | × | Capitalized Lessor's Cost | = | Amount Lessee in Default Must Pay |
|---|---|---|---|---|---|---|
| 99.910(%) | + | 6.538(%) | × | $11,200,000 | = | $11,922,176 |

Section 17(b) of the standard lease form provides that the lessee, if not in default, can terminate the lease by paying the termination value of the aircraft plus all rent due.[6] The aircraft is sold and the lessee receives the proceeds up to the amount of the termination value paid by the lessee.[7] The lessee must give Defendant ninety days written notice prior to the termination. Annex F lists the termination value of the aircraft for each month of the lease term. The terminated value is the sum of the Book ROI (return on investment) Protect Termination Value plus a "penalty adder" of three percent.

Simply stated, if a lease is *not* in default, the lessee can terminate the lease by paying the termination value of the aircraft. If the lease is in default, the lessee must pay the stipulated loss value of the aircraft. The termination value of an aircraft is less than the stipulated loss value.[8]

The Miscellaneous section of the standard lease form[9] states: "Any Rent or other amount not paid to Lessor when due shall bear interest from the due date until paid, at the lesser of 18 percent (18%) per annum or the maximum rate allowed by law. Any provisions in this Lease which are in conflict with any statute, law or applicable rule shall be deemed omitted, modified or altered to conform hereto."

The Miscellaneous section states that the lease shall be governed by and construed in accordance with the laws of the State of Connecticut.

Defendant prepares an internal document called a Summary Report when it enters into an aircraft lease. Defendant uses a software program known as Super-Trump to prepare the Summary Report. The Summary Report shows the financial aspects of the lease, including the asset cost,[10] rent to be received, residual value, security deposits received, taxes to be paid, and depreciation. The Summary Report contains a month-by-month report of the termination value and the stipulated loss value of the aircraft. Defendant may prepare several Summary Reports during the term of a lease as various conditions arise.[11]

In 1997, William K. Holmes had substantial business interests. Mr. Holmes decided that he needed a private aircraft to accommodate his business travel. In May of 1997, Mr. Holmes purchased a King Air 350 Beech aircraft. Defendant financed the purchase. Mr. Holmes signed on May 1, 1997, a promissory note for $2,375,000 and an Aircraft Security Agreement in favor of Defendant.[12] Mr. Holmes was to repay the obligation by making monthly payments over a period of ten years.

In late 1998, Mr. Holmes decided to upgrade to an aircraft designed for international business travel. On December 30, 1998, Mr. Holmes signed a Purchase

---

6. The lessee may want to terminate the lease because it wants a different aircraft or because it no longer needs an aircraft.

7. The lessee may receive a partial or total refund of the funds it paid to terminate the lease.

8. The termination "penalty adder" is less than the default "casualty adder."

9. The miscellaneous sections of the leases at issue are section 18(e) and section 20(e).

10. The asset cost is the capitalized lessor's cost of the aircraft.

11. For example, improvements may be made to the aircraft or the lessee may fail to make a rent payment. These and other events would change some of the financial values in the Summary Report.

12. Defendant's Exhibits 9 and 10.

Agreement [13] to purchase a Galaxy 1126 S/N 016 aircraft [14] from Galaxy Aerospace Company.[15] The purchase price was $17,000,000. Mr. Holmes was required to make progress payments on the Galaxy. Defendant financed $3,250,000 of Mr. Holmes' progress payments. Mr. Holmes also made $3,000,000 in progress payments that were not financed by Defendant. The Galaxy was to be delivered to Mr. Holmes on June 30, 2000.

Mr. Holmes decided to acquire another aircraft while awaiting delivery of the Galaxy.[16] On March 6, 1999, Mr. Holmes signed a Purchase Agreement [17] to purchase an Astra SPX 1125 S/N 101 aircraft from Galaxy Aerospace Company. The purchase price was $11,200,000. Mr. Holmes paid $500,000 to Galaxy Aerospace Company as an "initial payment at signing." Mr. Holmes also entered into a Trade–In Agreement [18] dated March 6, 1999, with Galaxy Aerospace Company. The agreement allowed Mr. Holmes to trade in the Astra when the Galaxy was delivered. Mr. Holmes was to receive a trade-in credit of $10,750,000 towards the purchase of the Galaxy.

Defendant agreed to assume Mr. Holmes' obligations to purchase the Galaxy and the Astra from Galaxy Aerospace Company. Defendant agreed to purchase both aircraft and then lease these aircraft to Mr. Holmes.

On July 26, 1999, Mr. Holmes formed a business entity known as Airtrek, LLC.[19] Mr. Holmes is the sole member [20] of Airtrek. All of Airtrek's capital was contributed by Mr. Holmes. Mr. Holmes controls Airtrek. The main purpose of Airtrek was to purchase, own, and manage aircraft for Mr. Holmes.

Galaxy Aerospace Company signed an Aircraft Bill Of Sale [21] dated July 27, 1999, documenting the sale of the Astra to Defendant. The cost of the Astra was $11,200,000. Defendant paid $10,700,000 to Galaxy Aerospace Company.[22]

Airtrek, as "Lessee," [23] and Defendant, "as Lessor," signed an Aircraft Lease Agreement [24] dated July 27, 1999. The lease is on Defendant's standard lease form. Defendant agreed to lease the Astra to Airtrek. The lease term was to expire on August 1, 2000.[25] Monthly rent payments were due on the first day of each month with a ten-day grace period. Rent payments would vary each month but would be approximately $65,000. The lease lists the "capitalized lessor's cost" of

13. Plaintiff's Exhibit 1.

14. S/N 016 is the serial number of the aircraft. S/N 016 means that this is the 16th aircraft of Galaxy model 1126 produced by Galaxy Aerospace Company.

15. This transaction is referred to as "Mr. Holmes' position in the Galaxy."

16. Mr. Holmes still had his King Air aircraft but did not want to use it for international travel.

17. Plaintiff's Exhibit 3.

18. Plaintiff's Exhibit 2.

19. Plaintiff's Exhibit 53.

20. The "owners" of a limited liability company are known as "members." O.C.G.A. § 14–11–101(16) (2003).

21. Plaintiff's Exhibit 4.

22. Mr. Holmes paid $500,000 to Galaxy Aerospace Company when he signed the Purchase Agreement for the Astra.

23. This lease and the other relevant documents were signed by Mr. Holmes on behalf of Airtrek, LLC.

24. Plaintiff's Exhibit 5.

25. The Galaxy that Mr. Holmes had ordered was to be delivered on June 30, 2000.

the Astra as $11,200,000. Defendant viewed the Astra lease as an accommodation to Mr. Holmes. Defendant would not have entered into the Astra lease but for also having the more profitable Galaxy lease and the guaranteed trade-in credit on the Astra.[26] The Trade–In Agreement mitigated Defendant's market risk upon disposal of the Astra.[27]

Dennis Blackburn is the president of Corporate Concepts International, Inc. (collectively "Mr. Blackburn"). Mr. Blackburn is a pilot and an aviation expert with considerable experience in aircraft appraisal, evaluation, maintenance, marketing, and sales. Mr. Blackburn provides comprehensive aviation services to customers worldwide. Mr. Holmes and Defendant both consider Mr. Blackburn to be a person of high integrity and professional competence. Mr. Blackburn was the only witness at trial who was not a party or an employee of a party[28] to this adversary proceeding. During the previous 20 years, Defendant has engaged Mr. Blackburn on a considerable number of occasions to assist Defendant with aircraft transactions. Some transactions involve Mr. Blackburn finding a potential lessee or purchaser of an aircraft for Defendant. Mr. Blackburn testified that, in his opinion, all of Defendant's representatives are very professional and very honest.

In the fall of 1999, Defendant engaged Mr. Blackburn to locate a particular model of aircraft that Defendant wanted to purchase for its portfolio, namely a Falcon 900B. The Falcon 900B is a premier and very desirable corporate aircraft that holds its value very well. The Falcon has one of the strongest markets in the aircraft business. Mr. Blackburn learned that Ford Motor Company wanted to sell one of its Falcons. Mr. Blackburn contacted Ford Motor Company and obtained the specifications for a Falcon 900B S/N 50. In September of 1999, Mr. Blackburn helped Defendant negotiate the purchase of the Falcon from Ford Motor Company.[29] Defendant paid $17,500,000 for the Falcon. Mr. Blackburn testified that the purchase price "was a below market price."[30]

Defendant then asked Mr. Blackburn to find a purchaser or a lessee for the Falcon. Mr. Blackburn advertised the Falcon in trade publications and by "networking his contacts." The Falcon was offered for sale, lease, or lease-purchase.[31] Mr. Blackburn testified that the fair market value of the Falcon in June of 2000 was around $21,750,000.[32] Defendant, through Mr. Blackburn, offered the Falcon for sale at $21,750,000. Defendant also offered the Falcon for lease with a term of two years. There was a strong market for a sale or a lease of the Falcon. A number of potential customers expressed an interest in the Falcon.

In early 2000, Mr. Holmes became concerned about reports he had received concerning performance problems with the Galaxy 1126.[33] Mr. Holmes decided to sell his position in the Galaxy. Mr. Holmes was selling his right and obligation to pur-

---

26. Trial Transcript, Day 2, p. 160.

27. Trial Transcript, Day 5, p. 5. The Astra did not have a strong resell market.

28. One of the witnesses, Peter Vasconcelos, was no longer employed by Defendant at the time of the trial of this adversary proceeding.

29. Plaintiff's Exhibit 16.

30. Trial Transcript, Day 1, p. 47.

31. Plaintiff's Exhibits 17 through 24.

32. Trial Transcript, Day 1, p. 124.

33. The Galaxy 1126 S/N 016 that Mr. Holmes had ordered from Galaxy Aerospace Company was to be delivered on June 30, 2000.

chase the 16th Galaxy model 1126 produced by the Galaxy Aerospace Company.

Mr. Holmes became aware that Defendant had a Falcon for sale or lease. Peter Vasconcelos was the Aircraft Releasing Manager for Defendant's Corporate Aircraft Group.[34] Mr. Vasconcelos was responsible for finding a customer for the Falcon. In the spring of 2000, Mr. Vasconcelos introduced Mr. Holmes to Mr. Blackburn as a "very important customer" of Defendant who had an interest in the Falcon. Defendant, through Mr. Blackburn, offered the Falcon to Mr. Holmes for $22,000,000. This included a base price of $21,500,000 and an allowance for custom upgrades of $500,000.

Mr. Holmes decided to lease the Falcon from Defendant. On May 26, 2000, Mr. Holmes, with Defendant's approval, engaged Mr. Blackburn to market the King Air, the Astra, and Mr. Holmes' position in the Galaxy.[35] Mr. Holmes no longer needed these aircraft.

Edward R. Ciccone, the Senior Risk Manager for General Electric Commercial Finance,[36] prepared a credit analysis on Mr. Holmes for the Falcon lease. Airtrek, as "Lessee," and Defendant, as "Lessor," signed an Aircraft Lease Agreement[37] dated June 30, 2000. The lease is on Defendant's standard lease form. The term of the Falcon lease was 144 months. Monthly rent payments of $166,000 were due on the first day of each month with a ten-day grace period. The base price of the Falcon was $21,500,000. Mr. Holmes requested certain "upgrades" which totaled $989,939. The final price of the Falcon to Mr. Holmes was $22,489,939. The Falcon lease lists the "capitalized lessor's cost" as $22,489,939. Defendant used this amount to determine the monthly rent payments.[38]

Airtrek signed a Security Deposit Pledge Agreement[39] dated June 30, 2000. Airtrek gave Defendant a security deposit of $2,200,000[40] in consideration of Defendant's agreement to lease the Falcon to Airtrek and to secure Airtrek's performance of its obligations under the lease. The Security Deposit Pledge Agreement provides that Defendant was to return the security deposit upon termination of the lease and satisfaction of Airtrek's obligations under the lease.

Airtrek signed a Cross–Collateral And Cross–Default Agreement[41] on June 30, 2000. The agreement provides that all presently-existing and after-acquired collateral shall secure Airtrek's performance on all obligations to Defendant. The agreement also provides that a default by Airtrek under any account or agreement shall be deemed to be a default under all other accounts or agreements.

Mr. Holmes signed an Individual Guaranty[42] on June 30, 2000. Mr. Holmes personally guaranteed Airtrek's obligations to Defendant.

34. Mr. Vasconcelos is no longer employed by Defendant.

35. Plaintiff's Exhibit 27.

36. General Electric Commercial Finance is a division of Defendant.

37. Plaintiff's Exhibit 6.

38. The capitalized lessor's cost is also used to determine the stipulated loss value and the termination value of the aircraft.

39. Plaintiff's Exhibit 8.

40. The security deposit came from Mr. Holmes' personal funds.

41. Plaintiff's Exhibit 7.

42. Plaintiff's Exhibit 11.

The Falcon was to be refurbished with certain upgrades requested by Mr. Holmes. Mr. Holmes engaged Mr. Blackburn to oversee the refurbishment. The Astra lease was to expire on August 1, 2000. Defendant agreed to extend the term of the Astra lease until December 31, 2000, so that Mr. Holmes could use the Astra until the Falcon was delivered.

Airtrek and Defendant signed an Amendment And Lease Extension Agreement[43] dated June 30, 2000. The amendment extended the term of the Astra lease until December 31, 2000. Defendant was to receive a credit of $10,750,000 when the Astra was traded in on the Galaxy. Defendant lost the trade-in credit when Mr. Holmes decided to sell his position in the Galaxy. This increased Defendant's risk upon disposal of the Astra at the end of its "very short-term lease."[44] Defendant decided to mitigate its risk by including a remarketing fee in the Astra amendment. The Astra amendment, at paragraph 4, required Airtrek to pay a remarketing fee of $1,000,000 on or prior to the expiration date of the Astra lease. Mr. Holmes testified that he and Defendant did not discuss the remarketing fee. Mr. Holmes testified that he did not know about the remarketing fee when he signed the amendment.[45] The amendment is a one-page document which discloses the remarketing fee. Defendant, through its counterclaim, does not seek to recover the remarketing fee in this adversary proceeding.[46]

Airtrek signed a Security Deposit Pledge Agreement[47] dated June 30, 2000

for the Astra. Airtrek gave Defendant a security deposit of $500,000.[48] The Security Deposit Pledge Agreement provides that Defendant was to return the security deposit upon termination of the Astra lease and satisfaction of Airtrek's obligations under the lease.

Mr. Holmes and Airtrek paid Defendant a total of $5,972,616.80 on or around June 30, 2000,[49] to close the Falcon lease and the Astra lease. The payments included the following charges:

| | |
|---|---|
| Falcon Security Deposit | $2,200,000.00 |
| Astra Security Deposit | 500,000.00 |
| Principal–Galaxy Loans [50] | 3,250,000.00 |
| Interest–Galaxy Loans | 22,616.80 |
| | $5,972,616.80 |

Shortly after signing the Astra amendment, Mr. Holmes called Mr. Vasconcelos and asked him to "explain some things to me." In response to the request, Mr. Vasconcelos sent Mr. Holmes a letter[51] dated July 3, 2000, which states:

Dear Bill,

Given your decision to cancel your contract with Galaxy Aerospace on the delivery of a new Galaxy aircraft I wanted to clarify your obligations regarding the Astra SPX.

As discussed when you cancelled the Galaxy purchase contract the buyback from Galaxy Aerospace for the Astra SPX in the amount of $10,750,000 is cancelled. You are obligated to GE Capital to honor that buyback of $10,750,000 cancelled by Galaxy. GE Capital will receive from you a securi-

---

43. Plaintiff's Exhibit 10.

44. Trial Transcript, Day 5, pp. 5–6.

45. Trial Transcript, Day 2, pp. 85–86.

46. Trial Transcript, Day 5, p. 40.

47. Plaintiff's Exhibit 9.

48. The security deposit came from Mr. Holmes' personal funds.

49. Plaintiff's Exhibits 58 and 59.

50. Defendant had financed $3,250,000 of Mr. Holmes' progress payments on the Galaxy.

51. Plaintiff's Exhibit 13 and 63.

ty deposit in the amount of $500,000 on the Astra SPX. In the event that the proceeds from the sale are less than $10,250,000 you are obligated to pay GE Capital any deficiency up to an additional $500,000 for a maximum total exposure of $1,000,000. Any deficiency greater than the $1,000,000 will be the responsibility of GE Capital. In the event that the Astra SPX is sold for any amount over $10,750,000 you [sic] security deposit for $500,000 will be returned to you in its entirety.

If you have any questions please feel free to call.

Sincerely,

/s/ Peter Vasconcelos

Peter Vasconcelos

Mr. Holmes testified that after receiving the letter, he understood that his maximum exposure on the Astra lease was $1,000,000. This included his $500,000 security deposit on the Astra plus a possible additional payment of $500,000. In July of 2000, Mr. Holmes was current on all his obligations to Defendant.

Mr. Vasconcelos testified that his letter applied to a "non-default scenario" in which Mr. Holmes would return the Astra to Defendant at the end of the Astra lease.

Mr. Vasconcelos testified that he did not have the authority to release or waive any of Defendant's rights under the Astra lease. Mr. Holmes and Mr. Vasconcelos had no further conversations on this issue.[52]

In July of 2000, Mr. Blackburn was trying to sell the King Air, the Astra, and Mr. Holmes' position in the Galaxy. Mr. Holmes, in late July of 2000, sold his posi-

tion in the Galaxy through an acquaintance at Galaxy Aerospace Company.[53] Mr. Holmes received the net proceeds of almost $400,000 around the end of July of 2000. Defendant could have claimed the net proceeds under the cross-collateral agreement[54] but decided to allow Mr. Holmes to retain the $400,000.

Mr. Holmes was well liked and respected by Defendant's representatives. Mr. Holmes had respect for Defendant's representatives.

The Falcon lease provided that the first rent payment was due on July 1, 2000. The Falcon was being refurbished with the upgrades requested by Mr. Holmes. Airtrek and Defendant signed an amendment to the Falcon lease dated September 1, 2000.[55] The amendment provides that Airtrek's first rent payment would be due on October 1, 2000. Mr. Vasconcelos testified that Airtrek was allowed a three month rent-free grace period because the refurbishing of the Falcon was taking longer than anticipated.

David Labrozzi has been employed by Defendant for twenty-six years. Since March of 2000, Mr. Labrozzi has been the Senior Vice President and General Manager of the Corporate Aircraft Group of General Electric Commercial Finance. Mr. Labrozzi is responsible for the operations and profitability of the corporate aircraft group.

Mr. Holmes' largest and primary source of income was his ownership interest in some 2,000,000 shares of stock in World-Com, Inc. In September of 2000, Mr. Holmes experienced financial problems. His WorldCom stock declined significantly in value. Mr. Holmes sent Mr. Labrozzi a

---

52. Trial Transcript, Day 3, pp. 149–55.

53. Defendant's Exhibit 29.

54. Plaintiff's Exhibit 7.

55. Plaintiff's Exhibit 14.

letter[56] dated September 19, 2000, requesting a termination of the Falcon lease and a refund of the monies that he had put into the lease. Mr. Holmes sent the letter at Mr. Labrozzi's request after he advised Mr. Labrozzi that he would not be able to make his payments under the Astra lease, the Falcon lease, or on the King Air loan. At the time Mr. Holmes sent the letter, he and Airtrek were current on all obligations to Defendant. Mr. Holmes received no response to his letter dated September 19, 2000.

Mr. Labrozzi and Mr. Ciccone were now responsible for handling Mr. Holmes' situation. Mr. Vasconcelos played a secondary role.

On or prior to September 21, 2000, Mr. Labrozzi advised Mr. Blackburn that Mr. Holmes would not be taking delivery of the Falcon.[57] Mr. Labrozzi told Mr. Blackburn "to get it [the Falcon] back into the marketplace." Mr. Blackburn began contacting prospective customers for the Falcon. In late September of 2000, Mr. Labrozzi instructed Mr. Blackburn to advertise the Falcon "for lease only." Mr. Labrozzi told Mr. Blackburn to maintain control over the Falcon and to keep the refurbishing project under control. This included terminating the custom equipment that Mr. Holmes had requested.

Mr. Holmes' and Airtrek's monthly payments on the Falcon, the Astra, and the King Air were due on October 1, 2000, with a ten-day grace period. Mr. Holmes sent a letter[58] dated October 5, 2000, to Mr. Labrozzi requesting a sixty-day grace period to allow him to move assets, make payments current, and pay off or terminate his loans and leases. Mr. Holmes and Airtrek were still within the ten-day grace period.

Mr. Holmes testified that he had timely made forty-one consecutive monthly payments to Defendant including his payments due in September of 2000. Defendant did not grant Mr. Holmes' request for a sixty-day grace period. Mr. Labrozzi testified that although Mr. Holmes had been a good customer and was a "complete gentleman," that Mr. Holmes owed roughly $35,000,000[59] that he was not going to be able to "stand behind." Mr. Labrozzi testified that he had to protect Defendant's investments.[60]

Mr. Ciccone, on behalf of Defendant, sent Mr. Holmes a fax[61] dated October 5, 2000, setting forth the "estimated termination values"[62] on the Falcon and the Astra, and the "estimated loan balance" on the King Air.

Mr. Holmes and Airtrek failed to make their lease and loan payments on October 1, 2000, and did not make the payments within the ten-day grace period. Mr. Ciccone sent Mr. Holmes notices of default dated October 13, 2000, on the Astra lease, the Falcon lease, and the King Air loan.[63]

Mr. Holmes, with Defendant's approval, engaged Mr. Blackburn to market the Falcon. Mr. Blackburn agreed to reduce his usual compensation. Mr. Holmes had pre-

56. Plaintiff's Exhibit 64.

57. Plaintiff's Exhibits 32 through 34.

58. Plaintiff's Exhibit 65.

59. Mr. Holmes' obligations included the Falcon, the Astra, and the King Air.

60. Trial Transcript, Day 4, pp. 42–43.

61. Plaintiff's Exhibit 66.

62. Defendant contends the "estimated termination values" do not include some of the default obligations in the leases because Mr. Holmes was not yet in default.

63. Plaintiff's Exhibit 67; Defendant's Exhibit 11.

viously engaged Mr. Blackburn to market the King Air and the Astra. Mr. Blackburn was now marketing all three aircraft.

Mr. Holmes was under a tremendous amount of stress to dispose of his aircraft, particularly the Falcon.[64] Mr. Blackburn communicated with Mr. Holmes several times each day concerning prospective buyers. Mr. Holmes urged Mr. Blackburn to do all he could to sell the aircraft.

Defendant initially authorized Mr. Blackburn to market the Falcon solely for a short-term or two-year lease. Defendant later instructed Mr. Blackburn to market the Falcon for a five-year lease. On or around October 20, 2000, Defendant authorized Mr. Blackburn to market the Falcon for sale at $23,650,000.[65] On October 20, 2000, Mr. Blackburn marketed the Falcon for short-term lease, long-term lease, and for sale.[66] Mr. Blackburn testified that in October of 2000, the Falcon market was strong and that there were few, if any, other Falcons available. Mr. Blackburn testified that a short-term lease would have been a commercially reasonable disposition of the Falcon.[67] Mr. Blackburn also testified that lessors prefer long-term leases rather than short-term leases. Mr. Blackburn testified that when a long-term lease is "on the books," that a long-term sublease is more desirable than a short-term sublease.[68]

The Falcon lease was on a standard lease form used by Defendant.[69] Section 8(a) of the lease provides in part: "Lessee shall not, without the prior written consent of lessor, sublet, charter, or part with possession of the aircraft...."

In October of 2000, Lucent Technologies, Inc. expressed to Mr. Blackburn an interest in subleasing the Falcon for a term of two years for about $230,000 per month. Lucent was credit-worthy and a very serious prospect. Lucent had purchased a new Falcon 900C which was to be delivered in about two years. Lucent was interested in using Mr. Holmes' Falcon 900B until its Falcon 900C was delivered. The monthly rent under the proposed two-year sublease to Lucent would have been some $64,000 more than Airtrek's monthly rent obligations of $166,000 to Defendant.

Mr. Blackburn referred Lucent to Mr. Vasconcelos. Mr. Holmes was not directly involved in the discussions with Lucent.[70] Mr. Labrozzi testified that Mr. Holmes asked him for permission to sublease the Falcon. Mr. Labrozzi and Mr. Ciccone determined that the proposed sublease was not in Defendant's best interest.[71] Mr. Labrozzi would not approve the sublease. The Falcon lease between Airtrek and Defendant had eleven and one-half years remaining on the original twelve-year term. Mr. Labrozzi believed that the aircraft industry was about to experience a decline in prices. Mr. Labrozzi believed that the aircraft market had "capped out" and that a downturn was coming. Mr. Labrozzi testified that his concern about the future value of the Falcon was the

---

64. The Falcon was the most expensive aircraft.

65. Plaintiff's Exhibit 47.

66. Plaintiff's Exhibit 38. Mr. Blackburn testified that this advertisement probably had been ordered two or three weeks earlier, noting the delay in print time. *See also* Plaintiff's Exhibit 43.

67. Trial Transcript, Day 1, p. 119.

68. Trial Transcript, Day 1, pp. 144–145.

69. Plaintiff's Exhibit 6.

70. Trial Transcript, Day 2, pp. 26–28.

71. Trial Transcript, Day 3, p. 20.

main reason for not wanting to enter into a two-year sublease with Lucent.[72]

Mr. Blackburn testified that Mr. Labrozzi has sound judgment concerning the aircraft financing business. Mr. Blackburn testified that, in his opinion, Mr. Labrozzi is very professional and very honest. Mr. Blackburn testified that aircraft prices generally follow the stock market. Mr. Blackburn testified that all aircraft markets dropped after September 11, 2001.[73] Mr. Blackburn testified that in November of 2002, the Falcon was worth some $15,000,000 to $16,000,000. Thus, the Falcon decreased in value by some $7,000,000 between October of 2000 and November of 2002. Mr. Blackburn testified that a Falcon 900B with a serial number in the 50s would currently be worth about $17,500,000.[74]

Mr. Holmes called Mr. Labrozzi and asked why he was being denied his right to sublease the Falcon. Mr. Holmes testified that Mr. Labrozzi's first response was that Defendant didn't know what the Falcon might be worth, if the subleasee would be credit worthy, or if the Falcon would be properly maintained. Mr. Holmes pressed for a "better answer." Mr. Holmes testified that Mr. Labrozzi replied: "Mr. Holmes, we wouldn't sublease [sic] to you under any condition, because you're no longer a financially substantial individual. And he said, we would have never dealt with you if you'd been in the financial condition that you're in now, originally."[75]

Mr. Holmes testified that Defendant "sold [the Falcon] out from under us in less than 30 days after I was late with my first payment in my life, not just to them."[76] Mr. Labrozzi testified that "a big question mark in my mind"[77] was Mr. Holmes' ability to honor his financial obligations in two years at the end of the proposed sublease to Lucent.

In November of 2000, Defendant decided to sell the Falcon to Bechtel Corporation for $23,000,000. Neither Mr. Holmes nor Mr. Blackburn were involved in negotiating the sale. Mr. Blackburn testified that the sale price "was a good buy for Bechtel" and "was slightly below market."[78] Mr. Blackburn also testified that $23,000,000 was a reasonable price.[79]

Mr. Blackburn sent Mr. Holmes a letter dated November 6, 2000,[80] stating that on Thursday afternoon (November 2, 2000) Mr. Vasconcelos had advised that Defendant had accepted an offer from Bechtel and that the Falcon was off the market pending the sale.

After learning of the pending Falcon sale, Mr. Holmes contacted Mr. Labrozzi and Mr. Ciccone on November 6, 2000, in an effort to resolve his obligations. Mr. Holmes testified that he was told that he "would be taken care of" and that his security deposit would be returned after certain charges were paid.

Mr. Ciccone sent Mr. Holmes a proposed "work-out agreement" on November 9, 2000.[81] The proposal was an attempt to

72. Trial Transcript, Day 4, pp. 75–78; 177–78.

73. The tragedy at the World Trade Center occurred on September 11, 2001.

74. Trial Transcript, Day 1, pp. 146–48.

75. Trial Transcript, Day 2, p. 37.

76. Trial Transcript, Day 2, p. 28.

77. Trial Transcript. Day 4, p. 76.

78. Trial Transcript, Day 1, p. 131.

79. Trial Transcript, Day 1, p. 152.

80. Plaintiff's Exhibit 47.

81. Plaintiff's Exhibit 70.

reach an agreement on Mr. Holmes' obligations. Mr. Labrozzi testified that Defendant was willing to work with Mr. Holmes but that Defendant did not want to take a loss. Mr. Holmes testified that the terms set forth in the proposed workout agreement did not reflect his telephone conversation of November 6, 2000, with Mr. Labrozzi and Mr. Ciccone.

Mr. Holmes retained Joseph J. Burton, Jr., attorney at law, to represent him and Airtrek in the negotiations with Defendant. Mr. Burton, on behalf of Mr. Holmes and Airtrek, sent a response to the proposed workout to Mr. Labrozzi on November 14, 2000.[82] Defendant made a counterproposal. Mr. Burton sent a response dated November 21, 2000,[83] to Defendant's counterproposal.

Mr. Ciccone sent Mr. Burton a "final proposal" on November 28, 2000,[84] which stated in part that Defendant would not accept any further counterproposals and that Defendant's final proposal would be deemed rejected unless Mr. Holmes accepted it by November 30, 2000. Defendant was concerned that the sale of the Falcon to Bechtel would be jeopardized unless Defendant moved quickly.

Mr. Holmes, as an individual and on behalf of Airtrek, and Defendant signed an Agreement dated November 30, 2000.[85] Mr. Holmes was represented by counsel when he signed the Agreement. The Agreement changed Airtrek's obligations under the Falcon lease, as amended. Mr. Holmes testified that prior to signing the Agreement, Mr. Vasconcelos told him that Mr. Labrozzi was going to take care of him and that he must sign the Agreement if "he wanted to get anything [a return of his security deposits] at all." Mr. Holmes contends that the Agreement does not contain a release, a waiver, or a merger clause.[86] Defendant does not directly dispute this contention.

The Agreement states that Airtrek desires to terminate the Astra lease and the Falcon lease, and that Mr. Holmes desires to pay off the King Air loan. The Agreement states that Defendant has accepted a cash offer of $23,000,000 for the sale of the Falcon. The Agreement states that Defendant is willing to terminate the Falcon lease for the amounts set forth in the Agreement. Any deficiency would be applied against the Falcon security deposit of $2,200,000. The Agreement would be governed by and construed under Connecticut law. The Agreement states that if the sale of the Falcon is consummated, the $23,000,000 in sales proceeds would be distributed against the following charges:

| | |
|---|---|
| Defendant's Investment in the Falcon [87] | $22,489,939.00 |
| Defendant's Carrying Costs [88] | 200,000.00 |
| Defendant's Breakage Costs | 500,000.00 |
| Interior Refurbishment Costs [89] | 145,583.00 |
| Other Costs and Expenses | Unknown |
| TOTAL | $23,335,522.00 |

Mr. Labrozzi testified that the breakage costs [90] and carrying costs [91] are "round

---

82. Plaintiff's Exhibit 71.

83. Defendant's Exhibit 7.

84. Plaintiff's Exhibit 72.

85. Plaintiff's Exhibit 15.

86. Mr. Holmes contends that the Agreement does not prevent him and Airtrek from asserting a breach of contract action and other causes of action against Defendant.

87. This is the capitalized lessor's cost as shown in the Falcon lease.

88. Plus $4,301.36 per diem interest after December 15, 2000, and until the Falcon was sold.

89. This is the cost of certain upgrades to the Falcon that Mr. Holmes requested after the Falcon lease was signed.

numbers." Mr. Labrozzi and Mr. Ciccone testified that the breakage costs and carrying costs were negotiated down from the actual amounts.[92] Mr. Ciccone testified that Defendant agreed to accept less in the Agreement than what it was entitled to under the Falcon lease. Mr. Ciccone testified that Defendant was trying to make the best of a bad situation and that Defendant was worried that the negotiations would jeopardize the sale of the Falcon to Bechtel.[93] Mr. Ciccone testified that Defendant's actual expenses for breakage costs were $682,782 and actual expenses for carrying costs were $451,642.80.[94]

The Agreement provides that the "net" (the remainder) of the Falcon deposit ($2,2000,000) and the Astra deposit ($500,-000) would be held as security for Airtrek's continuing obligations under the terms of the Astra Lease Security Deposit Agreement and as security for Mr. Holmes' obligations under the King Air loan.

Mr. Ciccone testified that under the terms of the Falcon lease, Airtrek's total obligations would have been $26,290,169.28.[95] Mr. Ciccone testified that by not enforcing some of the default provisions in the Falcon lease, the Agreement saved Mr. Holmes and Airtrek some $2,662,154. 80.[96] The concessions were made, in part, to give Mr. Holmes a chance to get his security deposits back. Mr. Labrozzi testified that he did not guarantee that Mr. Holmes would receive any refunds.[97]

Defendant sold the Falcon to Bechtel Corporation on February 21, 2001, for $23,000,000.[98] Mr. Blackburn testified that the Falcon sold for a reasonable price. Mr. Blackburn also testified that $23,000,000 was slightly below market.[99]

The Agreement dated November 30, 2000, provides that Defendant is entitled to per diem interest of $4,301.36 from December 15, 2000, until the date the Falcon was sold (February 21, 2001). This additional interest totals $292,492.48. Defendant applied part of the Falcon security deposit to the deficiency. Defendant contends that after the sale of the Falcon, Airtrek had a net or remaining security deposit of $1,571,985.52, which was calculated as follows:

90. Breakage costs is the prepayment penalty that Defendant must pay to its bondholders when Defendant pays a debt before maturity. Defendant borrowed certain funds for the lease term (12 years) when it leased the Falcon to Airtrek. If Defendant sold the Falcon, Defendant would repay its bondholders plus a prepayment penalty. Trial Transcript, Day 4, p. 51, 153–55.

91. Carrying costs is the amount of interest that Defendant, as a business unit, is charged by its parent company for having a non-earning asset (the Falcon lease in default) on its books. Trial Transcript, Day 4, pp. 49–50.

92. Trial Transcript, Day 4, pp. 58–59; pp. 67–68; Day 5, p. 19; Plaintiff's Exhibit 70.

93. Trial Transcript, Day 5, p. 25.

94. Trial Transcript, Day 5, pp. 19–20.

95. Mr. Ciccone testified that, under the default provisions of the Falcon lease, Defendant was entitled to the stipulated loss value ($24,527,977.27), the October rent ($166,-839.21), and default interest ($1,595,352.80). Trial Transcript, Day 5, pp. 16–18.

96. Trial Transcript, Day 5, p. 27. ($26,290,-169.28 minus $23,335,522 and minus additional interest of $292,492.48.)

97. Trial Transcript, Day 4, pp. 69–71.

98. Plaintiff's Exhibit 104.

99. Trial Transcript, Day 1, pp. 131,152.

| | |
|---|---|
| Amount Owed Under November 30, 2000 Agreement | $23,335,522.00 |
| Interest From December 15, 2000 Until February 21, 2001 | 292,492.48 |
| TOTAL | 23,628,014.48 |
| Less Sale Proceeds of Falcon | 23,000,000.00 |
| Deficiency | <628,014.48> |
| Plus Security Deposit on Falcon | 2,200,000.00 |
| Remainder of Security Deposit on Falcon | $ 1,571,985.52 |

Mr. Holmes sold the King Air aircraft in early 2001. Defendant had financed Mr. Holmes' purchase of the King Air. Mr. Holmes had defaulted on his October 2000 payment. Under the terms of the King Air promissory note, Defendant had the right to take possession upon default. Defendant, however, allowed Mr. Holmes to retain possession and to sell the King Air. Defendant also allowed Mr. Holmes to retain the sale proceeds in excess of his obligation on the King Air. Mr. Holmes retained some $500,000. Under the terms of the cross-collateral agreement,[100] Defendant could have claimed the excess proceeds and applied the proceeds to Mr. Holmes' other obligations. Mr. Labrozzi testified that Mr. Holmes had been a good customer who had run into tough times.

On March 12, 2001, Defendant returned a $100,000 "good faith deposit" to Mr. Holmes.[101] Mr. Holmes, through Airtrek, had made the deposit under the terms of a lease proposal on the Falcon in May of 2000.[102] Defendant could have applied the $100,000 against the first rent payment under the Falcon lease (i.e. the October 2000 payment).

The Astra was more difficult to sell than the Falcon. The Astra did not have a strong market or hold its value as well as the Falcon. The Astra lease, as amended, expired by its own terms on December 31, 2000. Mr. Holmes delivered the Astra to Defendant on or around January 1, 2001. Mr. Holmes continued to try to sell the Astra through Mr. Blackburn.

Mr. Ciccone testified that "we were in a work scenario" and that Defendant "allowed Mr. Holmes to maintain control over the sale of [theAstra]." Mr. Ciccone testified that Defendant had the right to sell the Astra but chose not to.[103]

Mr. Holmes was trying to sell the Astra for some $10,650,000. Similar Astras were selling for $8,000,000 to $9,000,000. Mr. Blackburn testified that "we were getting no takers [even when the price was reduced to] $9,650,000." The high asking price delayed the sale of the Astra.[104]

On April 9, 2001, Mr. Ciccone sent Mr. Holmes and his attorney a proposed "workout agreement" on the Astra.[105] Under the proposal, Defendant would "advance" to Airtrek $120,000 of the security deposits that Defendant was holding. Defendant would gain control of the marketing of the Astra. Defendant thought the Astra would sell more quickly if it controlled the marketing. Mr. Holmes did not accept the proposal.

On April 11, 2001, Mr. Holmes' attorney sent a letter requesting an accounting of all funds (security deposits) that Defendant had received from Mr. Holmes.[106] Mr. Ciccone sent a letter dated April 25, 2001, to Mr. Holmes' attorney.[107] Defendant contends that the letter is the ac-

100. Plaintiff's Exhibit 7.

101. Trial Transcript, Day 5, pp. 37–38.

102. Plaintiff's Exhibit 56.

103. Trial Transcript, Day 5, pp. 65–66.

104. Trial Transcript, Day 1, pp. 134–37.

105. Plaintiff's Exhibit 74; Defendant's Exhibit 24.

106. Plaintiff's Exhibit 75; Defendant's Exhibit 25.

107. Plaintiff's Exhibit 106.

counting requested by Mr. Holmes. Mr. Holmes disputes the results of the accounting.

Mr. Labrozzi testified that the letter dated April 25, 2001, was Defendant's "demand" for payment of the stipulated loss value and default interest of 18% under Section 12 of the Astra lease.[108] The letter does not contain the term "demand." Mr. Ciccone, the author of the letter, testified: "We did not make the demand. And, again, we were trying to work with Mr. Holmes. We did not want to enforce our remedies under the lease, and that's what Mr. Holmes was asking us not to do." [109] Mr. Ciccone also testified: "I can't say whether we—I can't say whether we made a demand or not. Legally I don't know if we made a demand or not." [110]

Mr. Blackburn was still trying to sell the Astra for Mr. Holmes.[111] Defendant found a purchaser for the Astra. Mr. Blackburn sent Mr. Holmes a fax dated October 31, 2001, stating that Defendant was accepting an offer of $9,000,000 for the Astra.[112] The last sentence of the fax says: "This is by far the best price we have seen in over a

year and I do not expect we could reasonably obtain a higher offer." Mr. Blackburn testified "that was a very strong number [price] for that airplane." [113]

Defendant sold the Astra on November 16, 2001, for $9,000,000.[114] Defendant contends that Airtrek's obligations under the Astra lease are as follows:

| | |
|---|---|
| Stipulated Loss Value as of October 2000 (Date of Default) | $11,290,384.00 [115] |
| Rent Payment for October 2000 | 66,851.97 |
| Default Interest 18% From Notice of Default (October 13, 2000) Until Date of Sale (November 16, 2001) | 2,234,730.65 [116] |
| | 13,591,966.62 |
| Less Sales Proceeds of Astra | 9,000,000.00 |
| Less Security Deposit on Astra | 500,000.00 |
| Deficiency | $<4,091,966.62> |

Defendant applied the remainder of the security deposit on the Falcon against the deficiency on the Astra. Defendant contends that Airtrek and Mr. Holmes owe the following:

| | |
|---|---|
| Remainder of Security Deposit On Falcon | $ 1,571,985.52 |
| Deficiency on Astra | <4,091,966.62> |
| Defendant's Counterclaim | $ 2,519,981.10 [117] |

in its post-trial brief. Docket No. 137, pp. 29, 35.

108. Trial Transcript, Day 4, p. 189.

109. Trial Transcript, Day 3, p. 40.

110. Trial Transcript, Day 3, p. 93.

111. Defendant's Exhibit 32.

112. Plaintiff's Exhibit 50.

113. Trial Transcript, Day 1, p. 121.

114. Plaintiff's Exhibit 92.

115. Defendant's counterclaim, paragraph 20, shows the stipulated loss value as $11,357,235.97. Plaintiff's Exhibit 111. Mr. Ciccone's letter dated April 25, 2001, shows the stipulated loss value as $11,290,384. Plaintiff's Exhibit 106. Mr. Ciccone testified that he did not know which amount was correct. Trial Transcript, Day 3, p. 104. Defendant seeks the lesser amount, $11,290,384,

116. Defendant contends that some of this interest would have been avoided if Mr. Holmes had lowered the asking price so that the Astra would have sold sooner.

117. This amount includes $292,492.48 for per diem interest which was not included in Defendant's proof of claim or counterclaim. Defendant asserted entitlement to the per diem interest at the trial of this adversary proceeding and in its post-trial brief. The Court is persuaded that Defendant has raised its demand for the per diem interest. (Fed.R.Civ.P. 15(b)) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."). Fed. R. Bank. P. 7015 provides that Rule 15 applies in adversary proceedings.

On December 12, 2001, Mr. Ciccone, on behalf of Defendant, sent Mr. Holmes a proposed "workout agreement" on the Astra.[118] Defendant offered to return $50,000 of the security deposits to Airtrek. Mr. Holmes did not accept the offer.

Mr. Labrozzi, at Mr. Holmes' request, reviewed Mr. Ciccone's offer to return the $50,000. Mr. Labrozzi sent Mr. Holmes a letter dated February 1, 2002, stating that he could not offer any more than Mr. Ciccone had offered.[119]

Two Statements of Financial Condition Unaudited for Mr. Holmes were admitted into evidence.[120] The statements list Mr. Holmes' financial condition as follows:

| Item | Statement Dated September 26, 1999 | Statement Dated March 1, 2001 |
|---|---|---|
| Total Assets | $233,546,000 [121] | $ 89,024,000 |
| Total Liabilities | $ 93,689,000 | $ 12,275,000 |
| Net Worth | $139,857,000 | $ 76,749,000 |

Mr. Holmes filed a petition under Chapter 11 of the Bankruptcy Code on July 1, 2002. Defendant filed on June 14, 2004, a proof of claim.

## CONCLUSIONS OF LAW

Mr. Holmes and Airtrek filed this adversary proceeding on October 10, 2003. Mr. Holmes and Airtrek assert a number of claims against Defendant including breach of contract, conversion, tortious interference with contract, fraud in the inducement, and turnover of property. Mr. Holmes and Airtrek request an accounting of the security deposits they paid to Defendant. Mr. Holmes and Airtrek contend that Defendant breached the Falcon lease

and the Astra lease by failing to return some or all of their security deposits. Mr. Holmes and Airtrek contend that Defendant committed conversion by failing to return their security deposits. Mr. Holmes and Airtrek ask the Court to order that Defendant turn over their security deposits.

Defendant, through its counterclaim, seeks to enforce the Falcon Agreement dated November 30, 2000, and the default provisions under the Astra lease. Defendant contends that it is entitled to retain and apply the security deposits against the obligations owed by Mr. Holmes and Airtrek. Defendant also seeks to recover from Mr. Holmes under his personal guarantee. The Court allowed Mr. Holmes and Airtrek to amend their pleadings to assert the defenses of illegal penalty and failure to demand payment.

The Falcon lease,[122] the Astra lease,[123] and the Agreement [124] dated November 30, 2000, state that the documents will be governed by and construed in accordance with Connecticut law. Mr. Holmes, Airtrek, and Defendant rely upon Connecticut law in their post-trial briefs. Mr. Holmes and Airtrek contend that the issue of liquidated damages is governed by Georgia law.

The evidence presented at trial shows that Mr. Holmes and Airtrek purchased or leased three aircraft. Mr. Holmes had a "position in" a fourth aircraft, namely a Galaxy 1126 S/N 016. Defendant financed the four transactions. Mr. Holmes sold the King Air aircraft and his position in

118. Plaintiff's Exhibit 77.

119. Plaintiff's Exhibit 107.

120. Plaintiff's Exhibits 54 and 78.

121. Mr. Holmes' shares of stock in World-Com, Inc. represented some 70 percent of his total assets.

122. Plaintiff's Exhibit 6, Section 20(f).

123. Plaintiff's Exhibit 5, Section 18(f).

124. Plaintiff's Exhibit 15, Section 4.

the Galaxy aircraft. Defendant allowed Mr. Holmes to retain the net proceeds from the sales of these aircraft. These aircraft are not directly in dispute in this adversary proceeding. The issues in dispute are Mr. Holmes' and Airtrek's obligations under the Falcon Agreement dated November 30, 2000, and under the Astra lease as amended.

*Fraud As To Cost Of The Falcon And The Astra*

■ Mr. Holmes and Airtrek contend that Defendant committed fraud by making false representations in the Falcon lease and the Astra lease. Mr. Holmes and Airtrek contend that Defendant misrepresented the cost of these aircraft.

■ "To make out a claim of fraudulent or negligent misrepresentation a plaintiff must show, *inter alia*, that there was a false statement of fact by the defendant and justifiable reliance on the statement by the plaintiff to its detriment. See *Citino v. Redevelopment Agency of City of Hartford*, 51 Conn.App. 262, 273–76, 721 A.2d 1197, 1206–07 (App.Ct.1998)." *Retrofit Partners I, L.P. v. Lucas Industries, Inc.*, 201 F.3d 155, 162 (2nd Cir.2000).

Defendant purchased the Falcon for $17,500,000. The Falcon lease lists the "capitalized lessor's cost" as $22,489,939. Mr. Holmes contends that Defendant deceived him concerning the "cost" of the Falcon. Mr. Holmes contends that he would not have agreed to the terms of the Falcon lease if he had known that Defendant had paid $17,500,000. Mr. Holmes contends that he would have questioned whether he was paying too much for the Falcon. Mr. Holmes did not ask Defendant what it had paid for the Falcon and

Defendant did not tell him what Defendant had paid.[125] Mr. Blackburn testified that a lessee usually does not know what the lessor paid for an aircraft. Mr. Blackburn testified that a value of $22,489,939 was a "reasonable number" and was "in an acceptable price [range]."

The Court is not persuaded that Defendant made a false representation or deceived Mr. Holmes. Defendant charged a reasonable price for the Falcon. Mr. Holmes may have assumed that "capitalized lessor's cost" means the amount that Defendant paid to purchase the Falcon. But there is no evidence that Defendant made that representation to Mr. Holmes. Mr. Holmes testified that he was not given an opportunity to discuss the cost because there were no negotiations with respect to the terms of the Falcon lease. Mr. Holmes was under no obligation to lease the Falcon and could have walked away if he disagreed with the terms. In the Court's view, Defendant had a very desirable aircraft and was charging what the market would bear.

Mr. Holmes also contends that Defendant deceived him concerning the "cost" of the Astra. The Astra lease lists the "capitalized lessor's cost" as $11,200,000. Mr. Holmes knew that the purchase price of the Astra was $11,200,000.[126] Mr. Holmes knew that he had paid $500,000 as an "initial payment at signing." Mr. Holmes knew that Defendant had paid $10,700,000 "out of pocket." The Court is not persuaded that Mr. Holmes was deceived.

*Fraud As To The Agreement Dated November 30, 2000*

■ Mr. Holmes and Airtrek contend that Defendant committed fraud by induc-

---

**125.** Trial Transcript, Day 1, pp. 201–202; Day 2, pp. 93–95; Day 3, pp. 197–98.

**126.** Mr. Holmes signed a Purchase Agreement to purchase the Astra from Galaxy Aerospace Company. The Purchase Agreement lists the Total Purchase Price as $11,200,000. Plaintiff's Exhibit 3.

ing them to enter into the Agreement dated November 30, 2000. Mr. Holmes and Airtrek contend that Defendant falsely represented that they would recover their security deposits. Mr. Holmes and Airtrek were represented by counsel when they signed the Agreement.

As previously stated, under Connecticut law, "To make out a claim of fraudulent or negligent misrepresentation a plaintiff must show, *inter alia,* that there was a false statement of fact by the defendant and justifiable reliance on the statement by the plaintiff to its detriment." *Retrofit Partners,* 201 F.3d at 162.

Mr. Holmes testified that prior to signing the Agreement, Mr. Vasconcelos told him that Mr. Labrozzi was going to take care of him and that he must sign the Agreement if he "wanted to get anything at all." [127] Mr. Labrozzi testified that the Agreement gave Mr. Holmes a chance to get back his security deposit, but that he did not guarantee any return.[128]

Defendant sold the Falcon on February 21, 2001. Pursuant to the terms of the Agreement dated November 30, 2000, Mr. Holmes owed a deficiency of $628,014.48. Defendant applied the Falcon security deposit of $2,200,000 against the deficiency. Mr. Holmes had a net or remaining security deposit of $1,571,985.52. Defendant, as authorized by the Agreement, held the $1,571,985.52 as security for the obligations owed by Mr. Holmes and Airtrek under the Astra lease and the King Air obligation. Mr. Holmes' attempt to sell the Astra for a high asking price delayed its sale. Defendant, after selling the Astra, applied the security deposits against the Astra deficiency, which exhausted the security deposits.

The Court is not persuaded that Defendant guaranteed or assured Mr. Holmes that his security deposits would be returned. The Court is persuaded that Defendant simply offered Mr. Holmes an opportunity to get a return. The Court is not persuaded that Defendant committed fraud in the inducement.

*Default Interest: Lesser Of 18% Or State Law Maximum*

■ Section 18(e) of the Astra lease [129] provides:

(e) Any Rent or other amount not paid to Lessor when due shall bear interest from the due date until paid, at the lesser of eighteen percent (18%) per annum or the maximum rate allowed by law. Any provisions in this Lease which are in conflict with any statute, law or applicable rule shall be deemed omitted, modified or altered to conform thereto.

Defendant seeks to recover default interest of 18 percent per annum on the obligations under the Astra lease. Mr. Holmes contends that the maximum interest rate allowed under Connecticut law is 10 percent. Mr. Holmes relies upon Section 37–3a (a) of the Connecticut General Statutes which provides:

§ 37–3a. Rate recoverable as damages. . . .

(a) Except as provided in sections 37–3b, 37–3c and 52–192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909, including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable. Judgment may be given for the recovery of taxes assessed and paid

**127.** Trial Transcript, Day 2, pp. 47–48.

**128.** Trial Transcript, Day 4, pp. 69–71.

**129.** Plaintiff's Exhibit 5.

upon the loan, and the insurance upon the estate mortgaged to secure the loan, whenever the borrower has agreed in writing to pay such taxes or insurance or both. Whenever the maker of any contract is a resident of another state or the mortgage security is located in another state, any obligee or holder of such contract, residing in this state, may lawfully recover any agreed rate of interest or damages on such contract until it is fully performed, not exceeding the legal rate of interest in the state where such contract purports to have been made or such mortgage security is located.

Conn. Gen Stat. § 37–3a(a) (2004).

Connecticut courts have reached different conclusions concerning the applicability of § 37–3a when a contract provides for an interest rate that is higher than 10 percent. Two courts have held that the interest rate cannot exceed the statutory rate of 10 percent.

In *Agranoff v. Loranger*,[130] the defendant entered into a fee agreement with the plaintiff-attorney for legal services. The defendant failed to pay his obligation and the plaintiff filed a complaint for breach of contract. The plaintiff was awarded $4,810. The Superior Court of Connecticut allowed interest on the award at 10 percent and stated:

> *Interest and Service Charges:*
>
> The fee agreement between the parties provides for a service charge of 1½% per month to be added to accounts over thirty days from date of statement, equal to an annual rate of 18%.

*Connecticut General Statutes § 37–3a* permits interest at the rate of ten percent (10%) and no more, per year, in a civil action. Eighteen percent is in excess of the statutory amount permitted. Categorizing it as a service charge does not remove this charge from the statutory limitation of ten percent. Interest in the amount of $635.00 is awarded based on a rate of ten (10%).

*See Bic Sport USA, Inc.v. Kerbel,* 995 F.Supp. 244, 257 (D.Conn.1997) (§ 37–3a allows interest of 10 percent per year on breach of contract claim even though the contract provides for interest of 1.5 percent per month on past due accounts).

Other Connecticut courts have held that § 37–3a does not apply when the contract provides for a different rate of interest. In *Little v. United National Investors Corp.*,[131] the defendant defaulted on two promissory notes. The state court entered judgment in favor of the plaintiff. The parties disagreed on the amount of interest due on the judgment. The statutory interest rate at that time was 6 percent. The promissory notes provided in part: "interest shall accrue at the rate of nine (9) per cent per annum on unpaid balances, before and after maturity, by acceleration or otherwise." The Supreme Court of Connecticut stated in part:

> The statute [§ 37–3, now § 37–3(a) ] is applicable to 'damages for the detention of money after it becomes payable' in those cases in which the contract makes no provision as to the rate of interest after maturity but is not applicable in those in which, as here, a rate of interest, otherwise lawful, is prescribed as applying from and after

**130.** 2004 WL 1098442 (Conn.Super.Ct. April 26, 2004). This is an unpublished decision by the Superior Court of Connecticut.

**131.** 160 Conn. 534, 280 A.2d 890 (1971).

the time when the principle becomes payable.

280 A.2d at 893.

See *In re Connaught Properties, Inc.*, 176 B.R. 678 (Bankr.D.Conn.1995) (2 percent per month interest rate in promissory notes controls over rate provided in § 37–3a for post-judgment interest rate); *Bankmart v. Sorrell*, 1994 WL 646264 (Conn.Super.Ct. Nov.8, 1994) ("Connecticut law has interpreted [General Statutes § 37–1 and 37–3a] together to read that if the parties agree upon a rate of interest until the balance is paid, then the agreed on rate becomes the legal rate in the case").

The Court is persuaded that it should follow the reasoning of the Supreme Court of Connecticut in *Little v. United National Investors Corp.* The Astra lease provides that the default rate of interest is the lesser of 18 percent per annum or the maximum rate allowed by law. The Court is persuaded that a Connecticut court would look to the lease and allow 18 percent interest. Mr. Labrozzi testified that 18 percent default interest is "pretty consistent" as an industry standard.[132] The Court is persuaded that Defendant is entitled to interest of 18 percent per annum on the default obligation under the Astra lease.

*Defendant's Refusal To Allow The Sublease Of The Falcon*

■ Mr. Holmes and Airtrek contend that Defendant breached the implied covenant of good faith and fair dealing by refusing to approve the two-year sublease of the Falcon to Lucent Technologies, Inc.

■ Good faith and fair dealing are questions of fact. What constitutes good faith or a lack thereof depends upon the facts of each case. The party asserting the lack of good faith has the burden of proof. *Kronberg Brothers, Inc. v. Steele*, 72 Conn.App. 53, 804 A.2d 239, 245, *cert denied* 262 Conn. 912, 810 A.2d 277 (2002). *Naek Construction Co. v. PAG Charles Street L.P.*, 2004 WL 2757623 (Conn.Super.Ct. Nov.3, 2004); *Barrett v. La Petite Academy, Inc.*, 2005 WL 896300 (Conn.Super.Ct. March 18, 2005).

■ In *Barber v. Jacobs*,[133] the Appellate Court of Connecticut stated:

"Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . Essentially it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. . . . Conversely, [b]ad faith means more than mere negligence; it involves a dishonest purpose." *Middletown Commercial Associates Ltd. Partnership v. Middletown*, 53 Conn. App. 432, 437, 730 A.2d 1201 [(1999)], cert. denied, 250 Conn. 919, 738 A.2d 657 (1999).

753 A.2d at 435.

■ In *Ruiz v. Dunbar Armored, Inc.*,[134] the court stated:

"[A]n action for breach of the covenant of good faith and fair dealing requires proof of three essential elements, which the plaintiff must duly plead: first, that the plaintiff and the defendant were parties to a contract under which the plaintiff reasonably expected to receive certain benefits; second, that the defendant engaged in

---

**132.** Trial Transcript, Day 4, p. 34.

**133.** 58 Conn.App. 330, 753 A.2d 430, *cert. denied* 254 Conn. 920, 759 A.2d 1023 (2000).

**134.** 2005 WL 1869028 n. 3 (Conn.Super.Ct. July 19, 2005).

conduct that injured the plaintiff's right to receive some or all of those benefits; and third, that when committing the acts by which it injured the plaintiff's right to receive benefits it reasonably expected to receive under the contract, the defendant was acting in bad faith." "Bad faith in general implies ... a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive ... Bad faith means more than mere negligence; it involves a dishonest purpose."

See *Warner v. Konover*, 210 Conn. 150, 553 A.2d 1138, 1140–41 (1989) (landlord who contractually retains the discretion to withhold his consent to the assignment of a commercial lease must exercise that discretion in a manner consistent with good faith and fair dealing).

Turning to the case at bar, Airtrek and Defendant signed the Falcon lease on June 30, 2000. Mr. Holmes experienced financial problems in September of 2000. The first rent payment on the Falcon lease, as amended, was due on October 1, 2000. Airtrek failed to make the first or any other rent payments. The Falcon lease had a term of 144 months. Monthly rent was $166,000. Lucent expressed an interest in subleasing the Falcon for two years for about $230,000 per month. Lucent's monthly rent payments would exceed Airtrek's rent obligations by $64,000 during the two-year sublease. Mr. Holmes testified that having these "extra funds" would have kept him out of bankruptcy.

Defendant initially authorized Mr. Blackburn to market the Falcon for lease with a two-year term. The Falcon at all relevant times enjoyed a strong market. Mr. Blackburn testified that a short-term lease would have been a commercially reasonable disposition of the Falcon. Mr. Blackburn also testified that lessors prefer long-term leases rather than short-term leases.

Defendant's senior vice president and general manager for its corporate aircraft group, Mr. Labrozzi, would not approve the proposed two-year sublease to Lucent. Mr. Labrozzi believed that the aircraft market had "capped out" and was about to experience a decline in prices. Mr. Labrozzi also recognized that Mr. Holmes' financial situation had changed. Mr. Labrozzi had concerns about whether Mr. Holmes would be able to honor his financial obligations at the end of the proposed two-year sublease. Mr. Blackburn testified that Mr. Labrozzi is very professional and honest and that he has sound judgment concerning the aircraft industry.[135] Mr. Labrozzi's judgment concerning the aircraft market proved to be correct.

The Falcon decreased in value by some $7,000,000 between October of 2000 and November of 2002. The current value of a Falcon 900B with a serial number in the 50s [136] is about the same as it was in November of 2002.

The Court is persuaded that Mr. Labrozzi used reasonable judgment in refusing to approve the two-year sublease. The Court is not persuaded that Mr. Labrozzi acted in bad faith or with a dishonest purpose. The Court is not persuaded that Defendant breached the covenant of good faith and fair dealing.

*Tortious Interference With Contract*

■ Mr. Holmes and Airtrek contend that Defendant's refusal to approve the

---

135. Trial Transcript, Day 1, p. 150.

136. Mr. Holmes' Falcon 900B was serial number 50.

sublease of the Falcon to Lucent constitutes tortious interference with their right to contract with Lucent. The Court has previously determined that Defendant did not act in bad faith or with a dishonest purpose in refusing to approve the sublease. The Court has determined that Defendant exercised reasonable judgment. The Court is not persuaded that Defendant tortiously interfered with Mr. Holmes' or Airtrek's right to enter into a contract with Lucent.

*Waiver of Damages Under The Astra Lease*

■ Mr. Holmes and Airtrek contend that Defendant waived any claim for damages that exceeds $1,000,000 under the Astra lease. Mr. Holmes and Airtrek rely upon the letter [137] dated July 3, 2000, from Mr. Vasconcelos. Mr. Holmes and Airtrek contend that Mr. Vasconcelos had, at a minimum, apparent authority to waive Defendant's rights when he sent the letter.

Defendant contends that the letter was not a waiver and that Mr. Vasconcelos did not have authority to waive Defendant's rights under the Astra lease. Defendant argues that Mr. Holmes and Airtrek did not raise the waiver issue until late in this litigation.

■ "Waiver is the intentional relinquishment of a known right." *Majernicek v. Hartford Casualty Insurance, Co.*, 240 Conn. 86, 688 A.2d 1330, 1335 (1997). Waiver is a question of fact. The party contending that a waiver occurred has the burden of proof. *Id.*

■ "[As] a general rule, a waiver [once made] cannot be revoked, except when all parties agree that it should be." *Matthews v. Nagy Brothers Construction Co.*, 88 Conn.App. 787, 871 A.2d 1067, 1069,

*cert denied* 274 Conn. 907, 876 A.2d 1199 (2005).

■ "The issue of waiver is a question of fact, dependent on all of the surrounding circumstances and the testimony of the parties." *Roy v. Metropolitan Property and Casualty Insurance Co.*, 98 Conn.App. 528, 909 A.2d 980, 982 (2006).

■ To prove waiver "It must be shown that the party understood its rights and voluntarily relinquished them anyway. Each case should be considered upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the party that is waiving its rights." *Krevis v. City of Bridgeport*, 262 Conn. 813, 817 A.2d 628, 635 (2003).

Airtrek and Defendant signed on June 30, 2000, an amendment to the Astra lease.[138] The amendment included a $1,000,000 remarketing fee. Shortly after signing the Astra amendment, Mr. Holmes called Mr. Vasconcelos and asked him to "explain some things to me." Mr. Vasconcelos sent Mr. Holmes a letter dated July 3, 2000, some three days after the Astra amendment was signed. Mr. Holmes was, at that time, current on all his obligations to Defendant. Mr. Vasconcelos testified that his letter applied to a "non-default scenario" in which Mr. Holmes would return the Astra to Defendant at the end of the Astra lease.

The Court is persuaded that Mr. Vasconcelos' letter addresses Mr. Holmes' obligations as a result of his decision to cancel his position in the Galaxy and the resulting loss of the trade-in credit on the Astra. The Court is not persuaded that the letter addresses Mr. Holmes' obligation should he default under the Astra

---

**137.** Plaintiff's Exhibits 13 and 63.

**138.** Plaintiff's Exhibit 10.

lease. The letter does not contain any default terms such as stipulated loss value, breach, liquidated damages, or default.

The Court is not persuaded that Defendant, through Mr. Vasconcelos' letter, waived its right to seek damages upon default in excess of $1,000,000. The Court, therefore, need not address whether Mr. Vasconcelos had authority to waive Defendant's rights.

*Demand For Stipulated Loss Value Under Astra Lease*

■■■ As a defense to Defendant's counterclaim, Mr. Holmes and Airtrek contend that Defendant failed to make a "demand" for the stipulated loss value under the Astra lease. Section 12(b) of the Astra lease [139] provides in part:

12. EVENTS OF DEFAULT AND REMEDIES:

. . .

(b) Upon the occurrence of any Event of Default and so long as the same shall be continuing, Lessor may, at its option, at any time thereafter, exercise one or more of the following remedies, as Lessor in its sole discretion shall lawfully elect: (i) demand that Lessee immediately pay as liquidated damages, for loss of a bargain and not as a penalty, an amount equal to the Stipulated Loss Value of the Aircraft, computed as of the Basic Term Rent Date prior to such demand together with all Rent and other amounts due and payable for all periods up to and including the Basic Term Rent Due Date following such demand;

■■■ Mr. Holmes and Airtrek contend that a "demand" was a condition precedent for Defendant to recover the stipulated loss value. " 'A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance.' *Lach v. Cahill,* 138

Conn. 418, 421, 85 A.2d 481 (1951)." *Pullman, Comley, Bradley and Reeves v. Tuck–It–Away, Bridgeport, Inc.,* 28 Conn. App. 460, 611 A.2d 435, 439, *cert denied,* 223 Conn. 926, 614 A.2d 825 (1992).

*Corpus Juris Secundum,* a leading legal treatise states:

> While statutory or contractual provisions must be observed, any language understood as a demand which gives the defendant an opportunity to perform in accordance with his or her obligation is generally sufficient.

> A legal demand means a demand properly made as to form, time, and place by a person lawfully authorized to make it on the person liable. Ordinarily, no particular form of demand is required, provided it gives the defendant an opportunity to perform. The sufficiency of such demand must be considered in the light of the circumstances. Generally, however, any language which is understood by the parties to be a demand is sufficient. Where regulated by statute or contract, the demand must be made in the form and manner prescribed.

> A demand is sufficient even though it calls for performance in excess of that due insofar as it affects defendant's obligation to perform in accordance with the obligation. It is, however, otherwise if such demand indicates that any performance less than that demanded will not be accepted.

1A C.J.S. Actions § 88 (2006).

Section 12(b) of the Astra lease provides that upon any event of default and so long as the default continues, Defendant may "at any time thereafter" demand that Airtrek immediately pay as liquidated dam-

---

**139.** Plaintiff's Exhibit 5.

ages the stipulated loss value of the Astra and all rent and other amounts due.

The Court is persuaded that Mr. Ciccone's letter[140] of April 25, 2001, was a demand that Mr. Holmes pay the stipulated loss value and 18 percent default interest. The letter uses the terms "stipulated loss value" and "default interest rate (18%)." The letter lists the amounts that Defendant seeks to recover. Mr. Holmes knew or should have known that Defendant was seeking to recover the stipulated loss value and default interest. Defendant also sought to recover the stipulated loss value and default interest through its counterclaim and its proof of claim. *First Hartford Realty Corp. v. Ellis,* 181 Conn. 25, 434 A.2d 314, 319–320 (1980) (demand for payment asserted in counterclaim constituted proper demand).

The Astra lease provides that, upon default, Defendant may demand payment "at any time thereafter." The Court is persuaded that Defendant made sufficient demand.

*Amounts Due Under Agreement Dated November 30, 2000*

█ Airtrek defaulted on its first rent payment under the Falcon lease. The payment was due on October 1, 2000, with a ten-day grace period. Defendant, Airtrek, and Mr. Holmes signed an Agreement[141] dated November 30, 2000. The Agreement changed and reduced some of the financial obligations of Mr. Holmes and Airtrek. The Agreement provides in part that their obligations as to the Falcon would total $23,335,522, plus certain per diem interest until the Falcon was sold. The obligations would be reduced by the proceeds from the sale of the Falcon. Defendant's representative, Mr. Ciccone, testified that this amount was some

$2,662,154.80 less than what Airtrek would have owed under the default provisions of the Falcon lease. Mr. Holmes argues that Defendant's representatives at trial could not calculate or quantify the Breakage Costs and Carrying Costs and that some of the Interior Refurbishment Costs should have been assessed against Bechtel Corporation, the purchaser of the Falcon.

At the trial of this adversary proceeding, Defendant's representatives were unable to reproduce some calculations. Mr. Labrozzi testified that the Breakage Costs and Carrying Costs are "round numbers" and are not the precise amounts called for in the Falcon lease. Mr. Labrozzi and Mr. Ciccone testified that the amounts shown in the Agreement are less than the amounts that Defendant was entitled to receive under the default provisions. The Court is persuaded that Airtrek's obligations under the Agreement are less than its obligations under the Falcon lease.

Under the Agreement, Defendant agreed to accept less in order to resolve the Falcon situation. Mr. Holmes and Airtrek agreed to pay more than what they believed they should pay. Mr. Holmes and Airtrek were represented by counsel when they signed the Agreement.

"There is an old saying in the legal profession: A good settlement is one that neither party is truly happy with." *Kelley v. Grot, (In re Grot),* 291 B.R. 204, 210 (Bankr.M.D.Ga.2003).

"There are few rules of law more fundamental than that which requires a party to read what he signs and to be bound thereby. This rule has particular force when the party is well educated and laboring under no disabilities." *Hudson v. Windholz,* 202 Ga.App. 882, 416 S.E.2d 120, 124 (1992).

---

**140.** Plaintiff's Exhibit 106.

**141.** Plaintiff's Exhibit 15.

The Court is persuaded that Defendant is entitled to recover the amounts provided for in the Agreement dated November 30, 2000.

*Liquidated Damages Under The Astra Lease*

The Astra lease [142] provides in part that upon default, Defendant may demand that Airtrek pay as liquidated damages the "stipulated loss value" of the Astra. Mr. Holmes and Airtrek contend that the obligation to pay stipulated loss value is an unenforceable penalty rather than liquidated damages. Mr. Holmes and Airtrek contend that Georgia law governs the liquidated damages issue because matters of Georgia public policy are involved. Mr. Holmes and Airtrek contend that Georgia law and Connecticut law are essentially the same on the liquidated damages issue.[143] Defendant does not dispute the contention that Georgia law governs this issue.

Georgia Code Section 13–6–7 provides:

> **13–6–7. Same—Liquidated damages generally.**
>
> If the parties agree in their contract what the damages for a breach shall be, they are said to be liquidated and, unless the agreement violates some principle of law, the parties are bound thereby.

O.C.G.A. § 13–6–7 (1982).

Section 12(b) of the Astra lease contains a provision for liquidated damages. Mr. Holmes and Airtrek contend that the provision "violates some principle of law."

Airtrek, as the defaulting party, has the burden of proving that the liquidated damages provision is a penalty. *Liberty Life Insurance Co. v. Thomas B.*

Hartley Construction Co., 258 Ga. 808, 375 S.E.2d 222, 223 (1989).

In *AFLAC, Inc. v. Williams,*[144] the Supreme Court of Georgia stated:

> "In deciding whether a contract provision is enforceable as liquidated damages, three factors must exist. The injury must be difficult to estimate accurately, the parties must intend to provide damages instead of a penalty, and the sum must be a reasonable estimate of the probable loss. *Southeastern Land Fund, Inc. v. Real Estate World, Inc.,* 237 Ga. 227, 230, 227 S.E.2d 340 (1976)" "A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty." Restatement (Second) of Contracts § 356(1).

444 S.E.2d at 317.

Whether a contract provision is a liquidated damages provision or an unenforceable penalty is determined by the intent of the parties at the time that the provision was originally proposed and agreed upon. *Hopkins v. Garner & Glover Co.,* 233 Ga.App. 264, 504 S.E.2d 78, 82–83 (1998). *See* 25 C.J.S. Damages § 176 (2007).

"The labels and forms of words used in a contract do not determine whether the provision is enforceable as liquidated damages." *Lager's, LLC v. Palace Laundry, Inc.,* 247 Ga.App. 260, 543 S.E.2d 773, 778 (2000).

Turning to the case at bar, the determination of whether the obligation to pay stipulated loss value is an enforceable liquidated damages provision depends upon the intent of Airtrek and Defendant

---

**142.** Plaintiff's Exhibit 5, Section 12(b).

**143.** Plaintiffs, William K. Holmes And Airtrek LLC's, Proposed Findings Of Fact And Conclusions Of Law, p. 27, n 3, Docket No. 136.

**144.** 264 Ga. 351, 444 S.E.2d 314 (1994).

at the time they entered into the Astra lease on July 27, 1999.

The Astra lease provides that Defendant may recover the stipulated loss value if the lease is in default. Mr. Labrozzi testified that in a default situation, Defendant has made a huge investment in the aircraft and that Defendant wants to recover the benefit of the bargain that it had counted on when it entered into the lease. Mr. Labrozzi testified that when a lease is in default, that Defendant is required to "spend lots of time, lots of effort, a lot of management attention to working through a problem." [145] Mr. Labrozzi testified that in a default situation "there's a lot more risk" and that Defendant "wants to be sure it is compensated for that risk."

The stipulated loss value of the Astra is obtained by multiplying the capitalized lessor's cost ($11,200,000) times the appropriate percentage listed in Annex F of the Astra lease. The percentage generally decreases each month during the lease term. The percentage is the sum of the "Book ROI (return on investment) Protected Termination Value" [146] plus a "casualty adder."

The Astra was purchased for $11,200,000 in March of 1999.[147] The Astra lease went into default in October of 2000. Defendant sold the Astra in November of 2001 for $9,000,000. The Court can only conclude that the Astra suffered a decrease in value of $2,200,000 between March of 1999 and November of 2001.

The Court will apply the three factors set forth in *AFLAC, Inc. v. Williams*. First, the injury must be difficult to estimate accurately. Neither Mr. Holmes nor Defendant expected Airtrek to default on the Astra lease. Upon a default, Defendant's damages would include the loss of a rental income stream, the potential for loss upon repossession and resale of the aircraft, and the time, effort, and management attention of Defendant's representatives in working through a default situation. These damages would vary depending upon the timing and circumstances of the default. The condition of the aircraft market at some undetermined future time (i.e. the time of the default) is uncertain. The Court is persuaded that the injury that Defendant may suffer upon a default was difficult to estimate accurately when the Astra lease was entered into.

Second, the parties must intend to provide for damages instead of a penalty. The liquidated damages provision in the Astra lease gave Mr. Holmes and Airtrek an opportunity to understand their obligation should a default occur. Defendant seeks to recover the benefit of the bargain that it had counted on plus compensation for its time, effort, and management attention in dealing with the default situation. Airtrek, as the defaulting party, received a credit for the sale price upon resale of the Astra. In a favorable aircraft market, the defaulting lessee may owe a small or no deficiency. The Court is persuaded that Airtrek and Defendant intended to provide for damages rather than a penalty.

Third, the sum must be a reasonable estimate of the probable loss. Defendant has been in the business of leasing and financing the purchase of corporate aircraft since 1977. Defendant has provided leasing and financing services for thousands of customers. Although the circumstances surrounding each default will vary,

---

**145.** Trial Transcript, Day 4, p. 27–28.

**146.** Book ROI Protect Termination Value is the amount Defendant would have to receive in order to make the return on investment

that Defendant anticipated in that particular month.

**147.** Plaintiff's Exhibit 3.

Defendant has experience with what is generally involved in dealing with a default. Through the stipulated loss value provision, Defendant seeks to recover the benefit of the bargain and compensation for the time and effort it spends in dealing with a default. Defendant then gives the defaulting lessee "credit" for the sale price of the aircraft. The Court is persuaded that this is a reasonable estimate of Defendant's probable loss.

Mr. Holmes and Airtrek argue that if Airtrek had not defaulted on the Astra lease, that Airtrek's remaining obligations would have been for three months rent [148] plus the $1,000,000 remarketing fee. Mr. Holmes and Airtrek contend that this "non-default" obligation would have totaled some $1,200,000. Mr. Holmes and Airtrek contend that Defendant's damages should be limited to $1,200,000.

The Court is not persuaded by this argument. If no default occurred, then Airtrek was to surrender the Astra at the end of the lease term. Defendant could have sold or leased the Astra to a new customer. Defendant would bear the risk that the Astra might decrease in value.[149]

But Airtrek defaulted on the Astra lease. Airtrek was obligated to pay the stipulated loss value of the Astra. Airtrek received "credit" for the sale price when the Astra was re-sold. Airtrek bore the risk that the Astra might decrease in value. In a favorable aircraft market, the sale price may equal or exceed the stipulated loss value. The Court is persuaded that Defendant is entitled to recover the damages as provided by the Astra lease.

The Court is persuaded that the default provisions in the Astra lease provide for liquidated damages rather than for a penalty.

*Request For An Accounting*

Mr. Holmes and Airtrek ask the Court to order that Defendant provide an accounting of their security deposits. In *Mankert v. Elmatco Products, Inc.,*[150] the Appellate Court of Connecticut stated:

> "An 'accounting' is defined as an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due...." "An accounting is not available in an action where the amount due is readily ascertainable. Equity will ordinarily take jurisdiction to settle the account if the facts create a reasonable doubt whether adequate relief may be obtained at law." "To support an action of accounting, *one* of several conditions must exist. There must be a fiduciary relationship, *or* the existence of a mutual and/or complicated accounts, *or* a need of discovery, *or* some other special ground of equitable jurisdiction such as fraud."

854 A.2d at 768–69.

Mr. Holmes and Airtrek seek an accounting of their security deposits and the charges made against the security deposits. Airtrek paid security deposits of $2,200,000 under the Falcon lease and $500,000 under the amendment to the Astra lease.

As to the Falcon default, Defendant seeks to recover the amounts shown on

---

**148.** Rent payments would vary each month but would be around $65,000. Airtrek would have owed rent for October, November, and December of 2000. The Astra lease, as amended, was to terminate on December 31, 2000.

**149.** Trial Transcript, Day 2, pp. 156–59.

**150.** 84 Conn.App. 456, 854 A.2d 766, *cert. denied* 271 Conn. 925, 859 A.2d 580 (2004).

Exhibits A, B, C, and D to the Agreement [151] dated November 30, 2000. These amounts total $23,335,522. The Agreement provides that Defendant is entitled to recover per diem interest of $4,301.36 from December 15, 2000, until the date the Falcon was sold (February 21, 2001). This additional interest totals $292,492.48. Thus, Defendant seeks to recover a total of $23,628,014.48 under the Agreement.

The default provisions of the Astra lease provide that Defendant is entitled to recover the stipulated loss value, the unpaid rent for October 2000, and default interest of 18 percent. These amounts total $13,591,966.62.

Mr. Holmes and Airtrek received a "credit" for the sale proceeds of the Falcon and the Astra. Defendant seeks the following amounts from Mr. Holmes and Airtrek:

*Charges*

| | | | |
|---|---|---|---|
| Falcon Default | | | |
| | Agreement Dated November 30, 2000 | $23,335,522.00 | |
| | Per Diem Interest | $     292,492.48 | |
| | | $23,628,014.48 | |
| Astra Default | | $13,591,966.62 | |
| | Total Charges | | $37,219,981.10 |
| *Credits* | | | |
| | Falcon Security Deposit | $ 2,200,000.00 | |
| | Falcon Sale Proceeds | $23,000,000.00 | |
| | Astra Security Deposits | $    500,000.00 | |
| | Astra Sale Proceeds | $ 9,000,000.00 | |
| | *Total Credits* | | $34,700,000.00 |
| *Defendant's Counterclaim* | | | $ 2,519,981.10 |

The Court is persuaded that Defendant has provided an adequate explanation of the amounts owed by Mr. Holmes and Airtrek and the charges made against the security deposits.

*Defendant's Loss Upon The Sale Of The Falcon*

■ Mr. Holmes and Airtrek contend that Defendant suffered no loss when it sold the Falcon to Bechtel. Mr. Holmes and Airtrek dispute Mr. Labrozzi's testimony that he was trying to "break even" on the Falcon lease which was in default.

Defendant purchased the Falcon from Ford Motor Company for $17,500,000.

The Falcon lease lists the capitalized lessor's cost as $22,489,939.[152] Defendant sold the Falcon to Bechtel for $23,000,000. Mr. Holmes and Airtrek contend that Defendant made a profit of $5,500,000 when it sold the Falcon to Bechtel. Under the Agreement dated November 30, 2000, the parties reached an agreement concerning Airtrek's obligation as to the Falcon default.

The Falcon was a premier and very desirable corporate aircraft. A number of potential customers expressed an interest in the Falcon before Mr. Holmes decided to lease it. Defendant charged a reason-

---

**151.** Plaintiff's Exhibit 15.

**152.** This includes a base cost of $21,500,000 and upgrades requested by Mr. Holmes which total $989,939.

able price for the Falcon in the Falcon lease. Defendant had a very desirable aircraft and was charging what the market would bear. The Court is not persuaded that Defendant's damages should be limited to the purchase price of the Falcon. Defendant was in business to make a profit and was entitled to receive a reasonable return on the Falcon.

## Conversion and Turnover of Security Deposits

Mr. Holmes and Airtrek contend that Defendant's continued possession of their security deposits on the Falcon and the Astra constitutes a conversion of those funds. Mr. Holmes and Airtrek demand that Defendant turn over the security deposits.

## Conversion

■ To establish "the elements of a conversion claim: the complaining party must show (1) title to the property or the right of possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property." *Johnson v. First Union National Bank,* 255 Ga.App. 819, 567 S.E.2d 44, 48 (2002).

## Turnover

Mr. Holmes and Airtrek rely upon section 542(b) of the Bankruptcy Code which provides in part that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to ... the trustee...." 11 U.S.C.A. § 542(b) (West 2004).

■ An action for conversion or turnover requires that the moving party be entitled to the property at issue. The Court has determined that Defendant is entitled to the security deposits that are the subject of the alleged conversion and turnover. The Court is persuaded that

Mr. Holmes and Airtrek are not entitled to the security deposits. Thus, Mr. Holmes and Airtrek have not demonstrated a claim for conversion or turnover.

## Defendant's Counterclaim

Defendant seeks to enforce the Falcon Agreement dated November 30, 2000, and the default provisions under the Astra lease. Defendant seeks to retain the security deposits of $2,200,000 and $500,000 that it received from Airtrek. Defendant seeks damages of $2,519,981.10 in its counterclaim.

The Court, having considered the evidence presented and the arguments of counsel, is persuaded that Defendant is entitled to retain the security deposits and that Defendant is entitled to recover from Airtrek damages of $2,519,981.10. Mr. Holmes personally guaranteed Airtrek's obligations and is obligated in his individual capacity.

## Conclusion

The Court is persuaded that Defendant is entitled to retain the security deposits of $2,200,000 and $500,000 that it received from Airtrek. Defendant is entitled to recover damages of $2,519,981.10. Airtrek and Mr. Holmes are jointly and severally liable to Defendant for the damages.

Mr. Holmes and Airtrek are not entitled to any recovery from Defendant.

An order in accordance with this memorandum opinion will be entered this date.